# REGISTER OF ACTIONS
## CASE NO. 16CV03923

| James Michael Murphy, MD vs Hannah Jolene Dockery Mosebach | § § § § § | Case Type: | **Tort - General** |
|---|---|---|---|
| | | Date Filed: | **02/10/2016** |
| | | Location: | **Multnomah** |

---

### PARTY INFORMATION

| | | Attorneys |
|---|---|---|
| **Defendant** | **Dockery Mosebach, Hannah Jolene** | |
| **Plaintiff** | **Murphy, James Michael, MD**<br>5080 Riordon Hill DR<br>Hood River, OR 97031 | **Pro Se** |

---

### EVENTS & ORDERS OF THE COURT

| | **OTHER EVENTS AND HEARINGS** | |
|---|---|---|
| 02/10/2016 | <u>Complaint</u><br>   *Defamation*<br>   Created: 02/16/2016 2:35 PM | |
| 02/10/2016 | **Service**<br>   Dockery Mosebach, Hannah Jolene<br>   Created: 02/16/2016 2:35 PM | Unserved |
| 02/16/2016 | **Arbitration - Eligible**<br>   Created: 02/16/2016 2:35 PM | |
| 02/26/2016 | <u>Return - Service (Not Served)</u><br>   Created: 02/29/2016 8:43 AM | |

---

### FINANCIAL INFORMATION

| | | | | |
|---|---|---|---|---|
| | **Plaintiff** Murphy, James Michael, MD | | | |
| | Total Financial Assessment | | | 531.00 |
| | Total Payments and Credits | | | 531.00 |
| | **Balance Due as of 03/18/2016** | | | **0.00** |
| 02/10/2016 | Transaction Assessment | | | 531.00 |
| 02/10/2016 | Counter Payment | Receipt # 2016-1808757 | Cynthia Millsdvm | (531.00) |

Page 1 - Exhibit 2

*Paid
531
RM*

James Michael Murphy MD

Plaintiff

vs

FILED
'16 FEB 10 PM 3:23
CIRCUIT COURT
FOR MULTNOMAH COUNTY

10 February 2016

16CV03923

Hannah Jolene Dockery Mosebach (DOB 8/08/1981)

11611 NE 41st Ave

Vancouver, WA   98686

Defendant

*Prayer $300,000*

Complaint: Plaintiff requests relief for defamation and malicious prosecution.

1.   Facts of the Complaint

Verified Correct Copy of Original 2/10/2016

On 7 December 2013 the Plaintiff, a physician, was notified in writing by Col Heidi Kjos
MD, commander of the medical clinic of the Oregon Air National Guard (ORANG) in Portland,
Oregon, that a member of the ORANG had made a complaint and signed a written statement
accusing the Plaintiff of an act she considered a sexual assault. The defendant accused the
plaintiff of performing an unauthorized pelvic examination and PAP smear during a routine

screening physical in November of 2011.  This act was deemed a sexual assault,  since at the time official policy was to defer all gynecological exams to the female member's primary care or obstetric/gynecologic provider. The defendant also added the allegation that the exam was unchaperoned and that the plaintiff had intimidated her into accepting this. The person who made this false statement has been identified to the Plaintiff as the Defendant, Hannah Dockery Mosebach, an ANG member working at the ORANG base in Portland, Oregon.

1.  Multnomah County has jurisdiction over this suit:

The incident occurred in Multnomah County, and all individuals involved were Title 32 members (not on federal orders) and the National Guard is under the command of the Governor of the state of Oregon making it not a federal concern, but rather a state and local concern. As a result, this suit is not subject to the Westfall Act (the Federal Employees Liability Reform and Tort Compensation Act of 1988, P.L. 100-694). Evidence to support this claim is provided in Exhibit A, a statement called the Department of the Air Force Letter of Declination for Investigation, in which they state they decline to investigate "based on the absence of jurisdiction. As reported, SUBJECT and VICTIM were not activated on federal status at the time of the alleged offense and the offense occurred in state owned facility." By declining to investigate or prosecute this allegation the Air Force substantiates that there is no authority to substitute the federal government for the above named defendant and to adjudicate the case in federal court. The jurisdiction for this case lies in the Multnomah county circuit court and the suit should be tried in this court.

2.  False Allegations

Initially upon making the complaint to her superior officers, the defendant requested that local law enforcement not be informed. Instead, the investigation was referred (finally) to a special division of the National Guard Bureau, the so-called Office of Complex Investigations or OCI[1].

---

[1] Also called the Office of Complex Administrative Investigations

Verified Correct Copy of Original 2/10/2016

The OCI is made up of attorneys and not of trained investigators, and the investigation the OCI performed did not turn up facts but instead produced a document with the clear goal being to successfully prosecute the plaintiff and protect the accuser, presumably because to act in such a manner would be politically expedient, given the climate of neglected and mismanaged previous sexual assaults. The relative incompetence of this particular body is attested to in two separate statements (Exhibits B and C, statement by Philip Betz and affidavit by Tom Patton). In this case, at least, the OCI's mission appears to be to find guilt in every alleged case of sexual assault, perhaps in an effort to compensate for a history of failing to prevent or properly prosecute sexual assaults in the past.

In spite of the stated conclusions of the OCI investigation, there exists no real or factual substantiation of the defendant's claims. There is no physical evidence, there is no witness support beyond hearsay recollections of friends confirming that she told them similar stories. There is considerable evidence that the event could not have occurred in the manner she reported. Indeed, her reports of the event have not been consistent. The investigators gave the defendant multiple opportunities to "clear up" her inconsistencies while interviewing the plaintiff only once. On his own, the plaintiff took and passed a lie detector test. The OCI report admits to finding the plaintiff credible and he has no history, after 30 plus years in health care, of reports or complaints of any similar abuse. The OCI investigation was fatally flawed as these two lawyers have described in their statements.

Additionally, the OCI report as a document has been presented in administrative military and municipal court in various forms, mainly as summaries, excerpts, and digests that have clearly been edited to present an effective prosecution. For example, the plaintiff first saw video tape of the accuser's initial interview in the separation hearing, an interview in which the accuser demonstrated clear animus toward the plaintiff that had nothing to do with the alleged event and that would have been a basis for establishing motive for her false allegation.

3. Anti- SLAPP ORS 31.150(2) does not apply

Verified Correct Copy of Original 2/10/2016

Plaintiff has filed a defamation suit previously and Plaintiff's suit was dismissed *without prejudice*. The defendant filed a successful motion to strike using the anti-SLAPP order ORS 31.150(2), wherein the defendant's statements were determined to be absolutely privileged and protected speech. To win this order, defendant claimed her only statements were made in an executive forum, that she had only made the accusations when she was reporting to her commanding officers in the National Guard. Her claims were submitted by her JAG, Major Adams in a sworn affidavit (Exhibit D) where he states she only made her statements in forums meeting the requirements of being executive or judicial in character.

The claims of the defendant (and the sworn statement of Adams) were disingenuous. Evidence, initially withheld from the plaintiff in the form of a letter of reprimand (Exhibit D, LOR from Jennifer Pardy to Mosebach) prove the defendant made statements alleging the event to multiple third parties[2], by definition defaming the plaintiff.

The LOR proves the defendant published her allegations multiple times to persons not in a judicial or executive context to individuals not involved in investigating or prosecuting her claims. While it is not clear that the defendant did *not* make these statements outside the auspices of her employer the National Guard, even if she had confined her story-telling to persons within the National Guard[3], precedence still establishes that damage from defamation can be perpetrated within a place of employment, and so her statements do constitute defamation. Specifically, plaintiff references Wallulis v. Dymowski, 918 P 2d. (Or 1996) and quotes: "Defamatory statements made by employees in the private sector to other employees in the private sector are unrelated to a judicial, quasi-judicial, or legislative function. Nor do the statements made here arise from plaintiff's consent or fulfill a statutory requirement."

3. Malicious prosecution

Subsequent to this so-called investigation by the National Guard Bureau's OCI, approximately one year later the defendant insisted local law enforcement be informed and she personally filed

---

[2] She claims to have told as many as 50 other persons.
[3] She did admit to informing her husband who is not a member of the NG.

Verified Correct Copy of Original 2/10/2016

a complaint making a sworn statement against the plaintiff. By doing so she has performed an act of malicious prosecution which must be adjudicated by the Multnomah County Court system.

Defendant made an official complaint to the Port of Portland Police alleging sexual assault by the plaintiff. Port of Portland Police referred the case to the District Attorney for Multnomah County. Defendant made a sworn statement and included *ad hominem* comments. She also claimed the plaintiff committed perjury in his filing of the previous defamation case against her when he wrote that the defendant's allegations were not substantiated[4].

Multnomah County DA declined to prosecute the case (Exhibit D): statement by Ramrus), and stated that there was no physical or witness evidence to support the allegations and that, in any case, the act described by the defendant did not constitute a sexual assault. He was also careful to discuss and dismiss the claim of perjury, stating that the plaintiff was believable when he said he was only stating what he believed to be true, and that statements from the plaintiff's JAG supported these statements.[5]

Malicious prosecution requires that there has been a legal action that dismisses or clears the alleged offender of reported claims of wrongdoing. This includes a *prosecutor electing not to prosecute*. Multnomah county district attorney Christopher Ramras decided not to prosecute this case (Exhibit E) giving numerous clearly exculpatory justifications, including the lack of physical, or witness corroborated evidence as well as his finding of the absence of a true criminal action. The lack of prosecution justifies a suit of malicious prosecution. A claim of malicious prosecution then provides for statements by the defendant to be protected only by qualified immunity, defeating any anti-SLAPP action against this defamation suit going forward (DeLong v. Yu Enterprises, Inc. (CC 16-97-03468; CA A103729; SC S48281).

---

[4] Plaintiff in his defamation suit stated that the investigation had not substantiated her accusations, when the investigators had found her claims substantiated. Plaintiff had not (per orders from his commanding officers) yet read the report but had instead heard from his JAG that there was no evidence either physical or witness testimony that had substantiated her claims.
[5] In addition, defendant's attorney, in arguing the anti SLAPP motion to dismiss against the plaintiff, did not mention or claim the plaintiff perjured himself, but instead argued directly against the plaintiff's claim the allegations were not substantiated. (Exhibit E Transcript of Motion to Dismiss)

Verified Correct Copy of Original 2/10/2016.

4. Defamation damages:

The accusation and its publication to third parties is harmful to the plaintiff and constitutes defamation:

the defendant's accusation is false and made knowingly. The defendant's communication of her allegations to third parties has seriously harmed the plaintiff, including subjecting him to an investigation, a separation hearing and, pending, an other than honorable discharge from his volunteer service in the National Guard. The plaintiff has been prevented from finding employment in Oregon. Her false accusation has resulted in a pending investigation by the Oregon Medical Board that may result in his losing his license and ability to practice in Oregon or to obtain a license to practice anywhere. In addition, the plaintiff has been subjected to the destruction of his reputation, the threat of losing his profession and livelihood, and there have been emotional consequences, both to himself and his family.

Conclusion:

So far no court has tested the truth of SSgt Mosebach's allegations. The plaintiff has had no chance to cross examine his accuser in a court of law or to challenge the lack of witness corroboration or physical evidence. The defendant has knowingly and cynically set out to destroy the plaintiff's reputation and make it impossible for him to practice his profession, a profession he has dedicated his entire adult life to. The Multnomah County Circuit Court has the duty to allow the plaintiff to be heard and to recoup damages in the amount of $300,000 for loss of income and emotional trauma.

_____

I certify that the above is true and correct to the best of my knowledge under penalty of perjury. I will have the Defendant served with the complaint within 14 days.

Respectfully Submitted,

Verified Correct Copy of Original 2/10/2016

*as authorized agent*

*Smith DVM ^ for James Michael Murphy, MD*

Lt Col James Michael Murphy MD
P.O. 55116
Portland, OR          or          5080 Riordan Hill Dr
Hood River, OR  97031

List of exhibits submitted

A) Air Force Letter declining to investigate

B) Statement of Philip Betz

C) Affidavit of Tom Patton

D) Declaration of Hannah Mosebach

E) Statement and e mail of Chris Ramras

F) Previous filing of defamation suit Murphy v. Mosebach

G) Letter of reprimand Hannah Mosebach

H) Complete OCI report on CD

I) E mail Joel Shapiro (civil lawyer for Mosebach) allowing entry of OCI report

J) Mosebach Police Report to Port of Portland police

Verified Correct Copy of Original 2/10/2016.

Page 8 - Exhibit 2



**DEPARTMENT OF THE AIR FORCE**
AIR FORCE OFFICE OF SPECIAL INVESTIGATIONS
JOINT BASE LEWIS-MCCHORD WASHINGTON

12 Dec 13

MEMORANDUM FOR: 142 FW/CC

FROM: AFOSI Det 305/SAIC

SUBJECT: Letter of Declination for Investigation

1. AFOSI Detachment 305 declines to investigate the incident based on the absence of jurisdiction. As reported, SUBJECT and VICTIM were not activated on federal status at the time of the alleged offense and the offense occurred in state owned facility.

2. AFOSI Detachment 305 referenced the following statue and Air Force Policy Directive in regards to our declination: 10 U.S.C § 802. Art. 2. (a)(3) and Air Force Policy Directive 71-1 paragraph 1.1.1 – 1.1.2.

THEODORE D. DAVIS, SA, DAF
Special Agent in Charge

*Global Power for America*

Verified Correct Copy of Original 2/10/2016.

*Exhibit A*



*Exhibit B*

# TULLY RINCKEY PLLC
## ATTORNEYS & COUNSELORS AT LAW
501 WEST BROADWAY, SUITE 821
SAN DIEGO, CA 92101
PHONE: (619) 357-7600
WWW.FEDATTORNEY.COM
EMAIL: INFO@FEDATTORNEY.COM

Office of the Adjutant General
Oregon Military Dept., ORARNG
PO Box 14350
Salem, OR 97309-5047

Dear General Hokanson:

The law firm of Tully Rinckey PLLC has been retained by LtCol Michael Murphy to assist him in the presentation of matters for your consideration prior to approving the findings and recommendations in this case. Review of the investigative history of the case and the proceeding transcript reflects numerous procedural and substantive errors that legally prejudiced the substantial rights of LtCol Michael Murphy to a fair hearing. As, such we respectfully request in accordance with AFI 56-3209 4.20.1 that the findings and recommendations of the board be set aside and that a new board be appointed to consider the case.

## Background

1. LtCol Murphy was notified on 23 October 2014 via correspondence entitled "Letter of Notification of Discharge Action" that he was being processed for separation from the Oregon National Guard for misconduct, professional dereliction and substandard performance of duty. The letter of notification alleged Dereliction of Duty for performing an unauthorized pap exam and failing to properly record the exam, an allegation alleging a false official statement, and a "false unsworn declaration." (emphasis added) The sole basis for the discharge action were the erroneous and flawed conclusions from an incomplete investigation by the Office of Complex Investigations (OCI). The basis of the allegations by grew from uncorroborated allegations by SSgt Hanna Mosebach that LtCol Murphy performed an unauthorized PAP exam back in 2011. The facts indicate that the team failed to thoroughly and professionally investigate the matter and focused their efforts towards substantiating the allegations in the case. They failed to conduct any effort to gather <u>all</u> the facts in the case and minimized, dismissed and discounted any evidence that was contrary to the allegation that they were tasked to investigate. They concluded in a remarkable and flawed reasoning process that the allegations of sexual assault were "substantiated" not based on any physical evidence but purely on the "behavior" of SSgt Mossbach and the "lack of any motive to fabricate." (emphasis added)

2. On 9 May 2015, a separation board hearing was conducted in the case. Members of the OCI who conducted the inquiry did not appear and testify at the board proceedings. Their investigative actions and conclusions that formed the basis for the decisions could not be examined by counsel or the panel members. At the conclusion of the proceeding, the board substantiated the findings and recommended that LtCol Murphy be separated with an Other Than Honorable Characterization of Service (OTH). As

_Verified Correct Copy of Original 2/10/2016_

discussed above, we request that a new board be appointed to consider the case based on: (1) the flawed investigative actions that preceded the Board process and most significantly, (2) failures to comply with the AFI 36-3209 during the hearing process. Both of these major deficiencies were to the legal prejudice of substantial rights of LtCol Murphy in the case.

<u>Prehearing Errors</u>

**Forum Selection.**

The case was mishandled at an administrative proceeding and not properly referred for notification and action by civilian authorities. Under current authority, both OSI and state law enforcement authorities were available options to investigate the matter. Further, The ONG had a <u>duty</u> per policy to notify law enforcement within 24 to 48 hours. This did not occur. Local law enforcement, specifically, the Port of Portland Police were not notified until a year after the complaint was alleged. Whether this was intentional decision or malfeasance on the part of the command is unclear. This unconscionable delay was to the legal detriment of LtCol Murphy. However, it is clear that had either of these professional investigative agencies been promptly notified and taken jurisdiction in the case, it would have resulted in a professional, thorough and complete investigation. This would have included proper evidence collection that would have served to exonerate LtCol Murphy. Further, if the local law enforcement authorities had taken jurisdiction of the matter, LtCol Murphy would have been tried in a court of law with formal rules of evidence, an adversarial process and the substantive and procedural protections afforded defendants in criminal cases. This would have provided LtCol Murphy with a fair hearing and held the government to <u>proof beyond a reasonable doubt</u>. When local law enforcement was finally notified, they not surprisingly declined to take the case. There is no evidence to indicate that the government aggressively sought local law enforcement to reconsider their declination decision. Instead, the government resorted to an administrative hearing process that would permit consideration of the incomplete, deficient investigation, extremely old allegations, and the use of a preponderance of the evidence standard of proof. The government was <u>fully aware</u> that based on the dated nature of the complaint, and lack of any evidence, they would have been unable to prove the allegations against LtCol Murphy in a court of law. Further, it is important to note that the the government also had the option of handling the matter as a professional matter and patient complaint. (Enclosure 3) However, this option was also ignored. As such, the government chose the administrative route as an "easy" way to present the case and increase the likelihood of their success. This effectively deprived LtCol Murphy of a host of due process protections that he would have received had law enforcement been promptly notified as required.

**OCI Investigators were not qualified to conduct the inquiry into the case.**

1. The Office of Complex Investigations (OCI) group was completely unqualified to investigate this case. The case from the outset specifically alleged that LtCol Murphy committed a criminal act, specifically his actions constituted a violation of Article 120 UCMJ Abusive Sexual Contact. Article 120 provides in part that "Any person subject to this chapter who commits or causes sexual contact upon another person if to do so would violate subsection (b) (sexual assault) had the sexual contact been a sexual act, is guilty

2

Verified Correct Copy of Original 2/1C/2016

of abusive sexual contact…" The provision further provides that "Sexual Contact" is any touching…if done with an intent to arouse or gratify the sexual desires of any person." The provision further provides that "bodily harm means any nonconsensual sexual contact."

2. The individuals from the OCI had no criminal investigation background or experience. They had no background in investigating sexual assault investigations. They had no expertise in the collection, storage and preservation of evidence. They were not criminal investigators, period. Their actions and lack of competent professional actions reflected that fact. Yet they concluded at the end of their narrow and limited inquiry that a criminal sexual assault was committed, and that LtCol Murphy committed it. However, they performed no actions consistent with investigation of a criminal incident. There was no examination for fingerprints on any items that were allegedly used to perform the examination, other equipment, furniture in the room, or anything else at the alleged "scene." There was no effort to collect hair samples or perform any type of scientific investigative effort to gather and preserve any possible evidence that was present. The team did not even inspect and examine the location where the incident allegedly occurred. This information could have effectively exonerated LtCol Murphy in the case. Further, during the course of the investigation, OCI performed limited interviews of personnel present during the weekend that the event allegedly occurred. Specifically, they interviewed female patients that were present at the facility that weekend and specifically inquired into whether they were subjected to a PAP exam. No male members were interviewed by the OCI group. Further, all the members that were seen by LtCol Murphy were not interviewed by the OCI group. This failure prevented the creation of an effective timeline of events that would clearly refuted the accuser, SSgt Mosebach's timing of the alleged "examination."

3. However, even though none of these minimal actions were performed, their conclusions consolidated in the report were relied upon by the command to send LtCol Murphy to an administrative discharge board. The U.S. Government has unlimited resources to include qualified professional investigators that could have thoroughly inquired into these matters, collected evidence and produced a complete investigation of the allegations. However, none of this was done in the case. This deprived LtCol Murphy of exculpatory evidence that would have been discovered and available had the appropriate investigative team been utilized. Based on the nature of the allegations and the career ending impact of the accusations, LtCol Murphy was entitled to a thorough, complete and professional investigation. The end result is that evidence that could and should have been gathered was not. This includes exculpatory evidence that could have exonerated LtCol Murphy. This failure in the investigative process is inexcusable and to the legal prejudice of the substantial rights of LtCol Murphy.

**Command investigators were not qualified to conduct an inquiry into the matter.**

The record of the proceeding reflects that at some point after the allegation were made the command attempted to start an 'investigation' into the case. Specifically, they made an effort to collect the instruments that were allegedly used by LtCol Murphy during PAP examination of SSgt Mossbach. Testimony that was elicited during the examination of MSgt Ray is telling. In the record he clearly admits that he has no background, training or experience in evidence collection, preservation and storage. He has no criminal investigative experience or specialized investigative experience gathering

3

evidence related sexual assault investigations. On the day that the items were collected, no Standard Operating Procedure was identified or observed. No gloves, no testing kit, no hair collection, no dusting for fingerprints or examination for existence of DNA in other areas of the room ever occurred at any time. Had any of these actions been performed it very well could have exonerated LtCol Murphy. The record reflects a completely and unprofessional attempt at evidence collection. (R.185-189)

<u>Hearing Errors</u>

**The legal advisor (LA) abused his discretion by applying formal evidentiary rules to the admission of evidence.**

AFI 36-3209 4.15.3.4 provides that "In making rulings, the legal advisor is not bound by strict rules of evidence. The legal advisor should maintain reasonable bounds of materiality, relevancy and competency."

1. The Legal Advisor (LA) erred when excluded evidence from admission that was clearly exculpatory to LtCol Murphy. Specifically, the Recorders Counsel (RC) offered the DNA testing results of the instruments that SSgt Mossbach had claimed were used by LtCol Murphy to conduct the PAP exam. The LA denied the admission of results that reflected <u>no DNA</u> was present on the instruments she alleged were used in the examination. (R. at 51) The results of the examination of the instruments finding <u>no DNA</u> of SSgt Mossbach on any of the 10 items ( 6 speculum instruments, 2 tubes of lubricant and 2 wooden depressors) was completely exculpatory for LtCol Murphy. However they were <u>not</u> admitted. The LA applied a standard of expert testimony as a prerequisite to admission. There was no basis to apply this standard of expert assistance to the administrative board proceeding. The lack of DNA on instruments that the complainant allegedly used by LtCol Murphy was <u>directly relevant and material</u> to the allegations. Had the members been able to examine the evidence and review the results, they would have concluded that the lack of DNA on the instruments raises a significant question as to the veracity of the allegations. The contention that an expert needed to be present to provide an opinion is preposterous. There were no medical terms or scientific evidence in the report. The report clearly states clearly in plain English that there was insufficient DNA to produce a profile. There was no conclusion as to what the analysis found. This evidence standing alone would have served to exonerate LtCol Murphy as to the main allegation in the case. However, it was excluded. This ruling was clearly an abuse of discretion by the LA. This decision and exclusion of this exculpatory evidence was plain error and to the legal prejudicial of substantial right of LtCol Murphy to present a defense in the case. This issue standing alone provides a compelling reason to set aside the findings and recommendations and direct a new panel to consider the case.

2. The LA erred when he instructed the members not to consider the comments made by Recorders Counsel (RC) that the DNA test results were 'inconclusive." Specifically, LA admonished the panel directing them that they were prohibited in considering this exculpatory evidence in the case. Specifically the legal advisor states in the record of the proceeding that:

LA: Yes, I sure can. You heard, and I'm going to paraphrase badly, but I think you guys are going to recall that there was a question of this witness from Captain Carlisle along the lines of, well the DNA test

Verified Correct Copy of Original 2/10/2016.

4

was inconclusive, wasn't it? She can't testify competently at all to the DNA test as to what it did or did not conclude or whether it was conclusive or not, so I'm going to ask you to disregard both the question and the answer, and not make any assumptions whatsoever about any DNA testing or the result thereof. Very good.

The comments made by the RC were directly relevant, material and competent. The members could have concluded based on consideration of this information that the primary allegations were not supported by the evidence. This ruling by the LA not to allow the members to even consider this information was legally prejudicial to the substantial legal right of LtCol Murphy.

3. The legal advisor stated that "he was not going to start explaining his rulings." (R. at 62) Throughout the proceeding the LA was applying rules of evidence to determine admissibility of evidence prior to consideration by the members. Upon questioning by the RC as to the basis for the ruling, he refused to provide underlying findings of fact and analysis in support of this conclusions excluding important evidence. This refusal prohibited the RC to examine the evidence in light of the ruling and articulate an alternate theory of possible admission. It is important to note that the LA is a civilian court judge with extensive experience in the practice of law. He was clearly equipped to provide a legal analysis to a young counsel defending a senior officer accused of sexual misconduct. The LA's failure to provide any basis for the rulings whatsoever effectively prevented LtCol Murphy from alternate approaches for evidence admissibility. This directly impacted a substantial legal right of LtCol Murphy to present evidence in the case.

4. The LA advised the members that the "rules of evidence do not apply." (R. at 79) However, it is evident as discussed above, that the LA applied the rules of evidence at various junctures of the proceeding. Specifically he made numerous ruling that excluded exculpatory evidence that would have assisted LtCol Murphy and the ultimately the members in concluding whether the allegations were supported by the evidence.

5. The LA did not permit the RC to discuss impact of adverse findings on LtCol Murphy's civilian career (R. at 546). At one portion of the proceeding, the respondents counsel raised the issue of the impact that the decisions could have on LtCol Murphy's license to practice medicine. This information was directly relevant and material to the case at hand. Since the members were not bound by strict rules of evidence they should have been permitted to consider the impact of their decision on his ability to further practice medicine. Awareness of these consequences would have assisted in ensuring that that their decision was deliberate and fair. Not allowing the members to consider this information was to the legal prejudice of the substantial rights of LtCol Murphy.

6. The LA did not permit LtCol Murphy to testify in his capacity as SSgt Mosebach's provider. The focus of the complaint was an allegation that LtCol Murphy assaulted SSgt Mosebach while she was under his care as a patient. SSgt Mosebach was untruthful to LtCol Murphy during the course of the exam interview. This information was directly relevant to the credibility of accuser. As such, LtCol Murphy's testimony related to this issue was directly relevant in the case. Further, the LA permitted the Rec to admit the medical record as evidence in the case. However, LtCol Murphy was prohibited on

5

Verified Correct Copy of Original 2/10/2016

commenting on what was not included based on the accuser's representation to him during his dialogue with her. LtCol Murphy's ability to testify regarding her untruthfulness to him would have raised questions as to her overall veracity and the believability of the complaint. The failure to allow this testimony was to the legal prejudice of a substantial right of LtCol Murphy in the case.

**The members had a predisposition to substantiate the allegations against Dr. Murphy.**

AFI 36-209 4.15.13 comments on the duties of the LA but illustrates that the board has a duty and the respondent has the right to an orderly, fair and impartial hearing. Implicit in the instruction is the duty that members have a duty to be fair and impartial in their consideration of the evidence in the case.

1. Two of the members who were selected, remained on the panel and ultimately voted to substantiate the allegations were not fair and impartial participants in the board process. On the contrary, evidence in the record clearly illustrates that they were both biased and partial. Specifically, the voir dire of Colonel Moffett and Colonel Schuler illustrated a clear disposition to substantiate the findings against LtCol Murphy. The record at 98 reflects the following exchange:

RC: Do you all understand that even though Brigadier General Stencel believed there was a basis for discharge and recommended discharge, you are tasked with arriving at your own independent conclusions on each and every one of those questions?

A: [All Board Members respond affirmatively.]

RC: Thank you. Would any of you hesitate to make a recommendation that conflicted with his recommendation?

BM (Col Moffett): Yes.

BM (Col Shuler): Yes.

BM (Col Wilbanks): No. Yes and no.

RC: [Laughing] Sorry, that may have been un-artfully worded. Would you hesitate to make a recommendation that conflicted with the Brigadier General Stencil?

BM (Col Wilbanks): No.

While Col Wilbanks clarifies his initial response, the other members Col Moffett and Col Schuler do not. There is no follow-up response by those two members following the RC rephrase of the question. Further, there was no follow-up question by the RC, Rec or LA regarding the response. As such, the response by both members is clear. Specifically, they would hesitate to make a recommendation that conflicted with his [BGen Stencil's] recommendation. This is telling and illustrates that both members

6

Verified Correct Copy of Original 2/10/2016.

clearly had a predisposition substantiate the allegations in the case. Based on this response alone, they both were clearly not qualified to serve as panel members and consider the case. Further, the RC did not exercise any challenge for cause and the LA did not "sua sponte" challenge either of the members for cause. The members were permitted to remain on the panel despite their clear predisposition to substantiate the allegations in the case. Consistent with their responses, they both voted to substantiate the allegations against LtCol Murphy and recommend his separation with an OTH in the case. Both members were unable to participate in a fair and impartial hearing. Their remaining on the panel was completely in violation of the AFI and to the legal prejudice of the substantial rights of LtCol Murphy in the case.

### OCI investigators did not testify at the proceeding

None of the OCI members that conducted their inquiry into the allegations were present to testify at the proceeding. This failure limited the RC to adequately and thoroughly evaluate the conclusions in their report and question their findings. Further, and more importantly, their absence deprived the panel members who had no knowledge of the case from conducting their own independent inquiry into their findings in the report. Without this ability, the members were unable to fulfill their duties as fact-finders and accurately assess the weight of the conclusions in the report. This ultimately inhibited their ability carefully scrutinize the "investigators" conclusions and make clear logical findings of fact regarding the evidence that was submitted. This ultimately was to the legal prejudice of the substantial rights of LtCol Murphy in the case.

### The government failed to promptly comply with respondent's discovery requests

1. Delays and refusal to provide requested discovery in a timely matter adversely impacted LtCol Murphy's ability to adequately prepare and present an effective defense to the allegations. Multiple items of evidence were requested from the government months before the proceeding was scheduled. A memorandum written by a key government character witness Colonel Richard Wedan was in the government's possession since December 2014. A discovery request was submitted in January 2015, however the memorandum was not provided to the RC until less than a week before the proceeding. (R. at 33, 34) In addition, despite repeated requests by the RC, contact information for Col Wedan was not provided to the RC until less than a week before the proceeding. (R. at 37) This information was also in governments possession. There was no valid reason for the delay by the Government in providing this information to the defense team in the case. They could have provided the information months before the board date when originally requested by the defense. However, the refused to comply. Despite the lack of timeliness of the discovery request, the LA overruled the RC objection and permitted the witness to testify in the proceeding. There is other evidence as well that was not provided in a timely fashion. This included the roll call sheet of patients that were seen on the day of the alleged incident, the appointment schedule detailing when patients to include SSgt Mosebach was seen, and patient charts that were only supplied shortly before the board date. This failure prevented contact of other witnesses, evidence and possible exculpatory information that LtCol Murphy could have presented at the board proceeding. There was no excuse for their failure to comply with the discovery request. The "last minute" provision of this information did not amount to compliance with discovery due to the fact

7

Verified Correct Copy of Original 2/10/2016.

that the information could not be thoroughly examined and further investigation conducted on the information. In sum, the information was of no value to LtCol Murphy and his ability to prepare effectively for the proceeding. The failure to provide this information was to the legal prejudice of the substantial rights of LtCol Murphy.

### The Recorder acted as a prosecutor throughout the proceeding.

AFI 36-3209 4.15.4.8 provides "the recorder is not a prosecutor and should not act like one." "The rule does not preclude the recorder from ensuring an adequate presentation of the government's case during the board hearing."

1. The recorder (Rec) clearly exceeded this defined role and presented the entire case as a prosecutor in a criminal case. While he is permitted by the rule to ensure an adequate presentation of the government's case, he made every effort to exclude evidence to offered by the RC that would have assisted the members with fair consideration of the allegations of the case. This includes the exculpatory DNA evidence previously discussed. His performance throughout the course of the proceeding to include his examination of witnesses, cross-examination of the RC witnesses, repeated objections and closing argument was identical to a prosecutor in a criminal case. Highlighting this fact is his reference to the allegations as a "sexual assault" a crime during his closing argument. His behavior was clearly inconsistent with the defined role outlined in the AFI. The recorder was not merely interested in presenting the government's case, but preventing LtCol Murphy from presenting his. Further, the LA never during the course of the proceeding admonished, counseled or directed that the Rec conform his behavior consistent with the clear mandate of the rule. The Rec's efforts were legally prejudicial to the substantial rights of LtCol Murphy.

2. The Rec exceeded the scope of his authority and role when he provided a definition of preponderance of the evidence as "more likely true than not." This definition was beyond the scope of his authority and inconsistent with the definition provided by the LA during his instructions to the members at the close of the proceeding. There was no effort to clarify or correct the statements by the Rec in the case regarding the definition of the standard of proof or most importantly, which definitions that the members should use in making their decisions in the case. This action was inconsistent with his role as Rec in the case.

### The evidence was insufficient to substantiate the allegations a, b, c in the Letter of Notification.

AFI 36-3209 4.17.1 provides that "The board determines whether a preponderance of the evidence supports each allegation set forth in the notice of the proposed separation."

1. The testimony of SSgt Mosebach is insufficient to establish by a preponderance of the evidence that LtCol Murphy conducted an unauthorized examination. A close review of the SSgt Mosebach's testimony during the administrative proceedings combined with her previous statements illustrates a myriad of inconsistencies and irregularities that do not support a finding that LtCol Murphy committed the allegations in the LON. Specifically, she could not accurately recall the layout of the room, location of furniture, and whether there were partitions. She could not accurately recall if she placed her feet in

Verified Correct Copy of Original 2/10/2016

"stirrups" for the examination, whether she was partially clothed and wore a gown, what items of her uniform were removed, and whether she undressed in front of anyone. In addition, her account of events differed between witnesses. When the initial allegation was made, SSgt Mosebach provided a general description of events to her Commander, Colonel Kijos. However, she never informed Col Kijos that she had changed rooms for the exam. This fact was conveniently added later in different accounts and descriptions of the allegation to other parties. Further as identified during cross examination, SSgt Mosebach was repeatedly inconsistent with her responses during the online PHA where she provided different dates for her last PAP exam. Most importantly, she never states during the online responses that she received an examination on 19 November 2011, the date that formed the basis for the allegations. Had the examination occurred on that date, it would have been reported. In addition, she failed to accurately report the medications that she was taking during this time. The inconsistencies, irregularities, untruthfulness, and unreliability of the testimony are evident. We request that SSgt Mosebach's transcript testimony be reviewed regarding this raised issue. Close examination of the testimony will illustrate its clear unreliability. The use of this unreliable and flawed testimony as a basis for the findings in this case was to the legal prejudice of the substantial rights of LtCol Murphy.

2. The configuration of the building where the examination allegedly occurred is inconsistent with the story provided by SSgt Mosebach describing how the events transpired. Further, evidence provided by other senior officers that were conducting examinations that day in the various exam rooms, the enormous number of patients that were being seen and examined, the high operating tempo that required patients to be rapidly examined and excused, and the frequent interruptions of the Dr.'s by the support staff make SSgt Mosebach's account of events implausible. Further, it is important to note that the building and the room were never examined by the members as part of their deliberative process. Had they had the opportunity to visit the location, they would have readily observed the implausibility of SSgt Mossbach's version of events in the case. A videotape "walkthrough" has been prepared in support of this petition and is provided as enclosure (1) for review.

3. As discussed previously, examination tools that SSgt Mosebach contends were used by LtCol Murphy during the examination did not contain any of her DNA. This is compelling. According to SSgt Mosebach, multiple instruments were allegedly used by LtCol Murphy during her examination. These 10 items were specifically identified by SSgt Mosebach, collected, and sent for DNA testing. However, none of the instruments tested positive for SSgt Mosebach's DNA. However, as previously discussed, this compelling evidence was withheld from consideration by the members. This clearly illustrates that evidence does not support the findings by a preponderance of the evidence.

4. In sum, the evidence does not support the conclusion that LtCol Murphy performed an unauthorized PAP exam, failed to document the examination, and made a false statement to investigators concerning his actions in the case.

### The evidence was insufficient to substantiate allegation d in the Letter of Notification

The allegation that LtCol Murphy intentionally made a false unsworn declaration is inaccurate. There was no intent on behalf to LtCol Murphy to mislead the court as to the basis of the allegations in the

Verified Correct Copy of Original 2/10/2016

case. LtCol Murphy stated during the proceeding that his remarks reflected his belief that the evidence that OCI used to substantiate the allegations in the letter of notification was insufficient. This was LtCol Murphy's belief at time. Further, the reason that he made this statement is that the information that they collected was insufficient. The OCI members did not form their conclusions based on the physical evidence in the case, but rather, incredibly, on [SSgt Mosebach's] physical and emotional reaction, demeanor, witness observations of behavior and absence of any apparent reason [for Mosebach] to make a false allegation." They did not base their conclusions on any physical evidence because OCI: (1) did not even attempt to develop and recognized the lack of any physical evidence and (2), they had no desire to fully and fairly investigate the allegations to determine if there was any evidence to support the contention that LtCol Murphy did not commit the alleged acts. From the outset, their investigation was completely one-sided, unbalanced, and unfair. Their conclusions were not based on reliable evidence that "it was more likely that not" that an assault occurred but rather <u>merely behavior and demeanor</u> of SSgt Mosebach. A plain reading of the investigation indicates that they clearly "struggled" to find a way to conclude that the allegations were "substantiated." This was completely arbitrary and capricious and illustrates the OCI conclusions were not substantiated based on the evidence. In sum, LtCol Murphy's contention that the allegations were not substantiated is supported by the evidence in the record. His statement to the court was accurate, reasonable and consistent with the lack of evidence the case.

**The instructions provided by the LA to the members prior to their deliberations were insufficient and erroneous.**

The LA provided his instructions to the members at the conclusion of the proceeding (R. at 632-636). They consisted of substantive and procedural content which was clearly deficient based on the allegations in the case. There were no definitions of Dereliction of Duty, False Official statement, or a False Unsworn Statement provided to the members prior to their deliberations. The record illustrates that the Letter of Notification mirrors UCMJ provisions and were drafted in accordance with the model specifications. While the standard of proof is different for an administrative proceeding, the elements of the allegations were not. Each of the allegations was derived from the Uniform Code of Military Justice Articles. Specifically, violations of Article 92, Dereliction of Duty and 107 (False Official Statement) UCMJ has discrete elements that need to be established for the offense or as in this case the allegation to be satisfied. Members were required to be advised that they needed to find <u>each element of each allegation by a preponderance of the evidence</u>. Further, they should have been advised that if they were not satisfied that all of the elements for each allegation were met by a preponderance of the evidence they <u>should not</u> have substantiated the findings for that particular allegation. Instead, they were merely read what was provided in the letter of notification as to the general allegations. They were provided no definitions of the any of the terms, no explanation of the elements that needed to be established to support the allegations. The information was just provided to the panel and left up to them to "figure it out". This was completely unfair to LtCol Murphy and was legally prejudicial to his substantial rights to a fair hearing.

10

Verified Correct Copy of Original 2/10/2016

**Other Evidence**

<u>Self-Reporting.</u>

1. LtCol Murphy self-reported the allegations to the Oregon Medical Board. It is important to note that after the allegations were made, LtCol Murphy voluntarily contacted the medical board explaining the false allegations against him. He did not try to conceal or minimize the fact that he had been accused of misconduct. He promptly informed the board to illustrate that he would completely cooperate with any inquiry into the matter and his desire to illustrate his innocence.

2. LtCol Murphy voluntarily self-reported the allegations to the Portland PD and other law enforcement authorities in order to "clear his name" and <u>specifically requested</u> an investigation into the allegations. Further and interestingly, SSgt Mosebach did not desire that the matter be investigated by law enforcement. Had LtCol Murphy's request been favorably considered, it would have ultimately exonerated him from the accusations in the case. LtCol Murphy reported the allegations seeking a professional and complete inquiry into the matter. He volunteered to speak with detectives and completely cooperate with any investigation. However, local law enforcement authorities declined to investigate. It is common sense and generally well accepted that guilty individuals do not voluntarily report to police agencies when they are accused of crimes. This fact standing alone is clearly an indication that LtCol Murphy did not commit the alleged misconduct.

<u>LtCol Murphy successfully completed a polygraph examination.</u>

1. LtCol Murphy submitted to and <u>successfully completed</u> a polygraph examination concerning the incident. (Encl 2) The test was administered by a former state police polygrapher who concluded that LtCol Murphy illustrated "no deception" with regards to whether he performed an unauthorized pap exam in the case. (Enclosure 2) This information was not considered by the members during their deliberations process concerning the allegations in the case.

<u>LtCol Murphy's character evidence</u>

1. The record of the proceeding is replete with senior officer witnesses that testified on behalf of LtCol Murphy in the case. They have all known LtCol Murphy for various periods of time in various capacities and are well qualified to venture an opinion on the character of LtCol Murphy. They all indicate clearly that Dr. Murphy would never commit an act of this type against anyone. It is completely contrary and inconsistent with his character as an officer and a man. Further, the government did not produce any witnesses to indicate otherwise. As an aside, it is well recognized that perpetrators of this type of act are repeat offenders. LtCol Murphy has never been accused of this type of allegation in 35 years of practice. This is compelling. A common thread running through all the testimony indicates that LtCol Murphy is not the type of individual that would commit the acts alleged.

11

Verified Correct Copy of Original 2/10/2016

<u>Conclusion</u>

AFI 36-3209 4.20.1.1 provides that the discharge authority may set aside the findings and recommendations of the board and direct that a new board be appointed to consider a case if the discharge authority finds that legal prejudice to a substantial right of the respondent.

1.  As discussed at the outset, there were numerous significant failures in the investigation that was conducted, qualifications of the investigators and collection of evidence in the case.  Further, and most importantly, careful review of the record of the proceeding illustrates numerous substantive and procedural errors in hearing process.  These failures during both the investigation and administrative hearing stage were to the legal prejudice of the substantial rights of LtCol Murphy and denied him due process in the case.

2.  Accordingly, we respectfully request that you set aside the findings and recommendations and direct a new board to consider the case.

Philip J. Betz Jr. Esq.
Counsel for LtCol Murphy

Encl:
1.  Videotape "walkthrough" of 142 FW Medical Group Facility
2.  Polygraph of LtCol Murphy conducted on June 24, 2015
3.  Sworn Affidavit of Colonel Tom Patton

12

Verified Correct Copy of Original 2/10/2016

# AFFDAVIT OF THOMAS C. PATTON

STATE OF OREGON       )
                           ) ss.

County of Clackamas    )

        After first being duly sworn, I, THOMAS C. PATTON, hereby depose and say that:

1.    I am a Judge Advocate General (JAG) attached to the Oregon National Guard (ORANG), currently assigned as the Air National Guard Assistant to the Secretary of the Air Force, Office of the Inspector General (IG), Pentagon, Washington, DC.

2.    By virtue of my attachment to the ORANG, I was temporarily assigned as Defense Counsel for Lt Col Michael Murphy, MD, on or about January 15, 2014, for purposes of an administrative investigation into allegations of an unauthorized medical procedure, which was, in my opinion, mistakenly mischaracterized as an administrative investigation into allegations of a sexual assault, because the procedure involved a PAP smear. Lt Col Murphy was interviewed as part of the investigation in early February, 2014.

3.    When the investigator's findings were finally released in approximately ~~July~~ August 2014, they were released with the caveat from our Commanding Officer, Brig Gen Michael Stencil, that the findings were to remain confidential and not released to the public for any reason. Because Lt Col Murphy was involved in a civil suit concerning the same incident, he refused to read the findings. Lt Col Murphy asked me if they had found any evidence to support her allegation that an unauthorized PAP smear had taken place. There was absolutely no corroborating evidence in the report, beyond the statements of the accuser, that the PAP had occurred, and I relayed that to Lt Col Murphy.

4.    Thereafter, Lt Col Murphy concluded that the accusation was "unsubstantiated", and used that phrase to describe the report's findings.

5.    "Unsubstantiated" and "substantiated" are IG Inspection terms-of-art that do not share the dictionary definition, nor the definition in standard, lay use. In IG inspection reporting,

AFFIDAVIT OF THOMAS C. PATTON - 1

Thomas C. Patton
8 N. State St., Ste. 301
Portland, Oregon 97034
503.546.3357

Verified Correct Copy of Original 2/10/2016.

Exhibit C

1   the terms "substantiated" or "unsubstantiated" represent the inspector's opinion and "finding" as

2   to whether the accuser's claim was supported by the preponderance of the evidence.

3          6.      In my opinion, given the complete lack of any corroborating evidence, the

4   investigator's "substantiated" finding was completely wrong, and does not comport with the

5   legal standard for an administrative investigation, because it was not supported by a

6   preponderance of the evidence.

7          7.      The investigator supported his finding by stating that the accuser had no motive

8   for making up such an outrageous story, which ignored her pecuniary gain motive.

9          8.      The investigator further supported his founded determination stating, in essence,

10  that the accuser's story is so far-fetched that it must be true.  That statement defies logic.

11  Acknowledging the far-fetched nature of the accuser's story undermines its likelihood; it does

12  not enhance it.

13         9.      In my opinion, as an experienced IG investigator, and as a very experienced (29

14  year) JAG who has performed many dozens of IG Investigation Legal Reviews, this

15  investigation should have, by the preponderance of the evidence, yielded an unsubstantiated

16  finding, and thus terminated all further inquiry.  The only explanation I can conceive for the

17  investigator's incorrect finding in this case is that the current, hyper-vigilant climate in the Air

18  Force regarding sexual assault did not allow for an objective evaluation of the evidence.

19         Dated this 3rd day of June, 2015.

20

21                                                Thomas C. Patton

22  SUBSCRIBED AND SWORN to before me this 3rd day of June, 2015.

23

24          OFFICIAL SEAL
            SHARON L FEHRS
25       NOTARY PUBLIC-OREGON
       COMMISSION NO. 480310          Notary Public for Oregon
     MY COMMISSION EXPIRES SEPTEMBER 27, 2017   My Commission expires: 9/27/17

AFFIDAVIT OF THOMAS C. PATTON - 2                    Thomas C. Patton
                                                    8 N. State St., Ste. 301
                                                    Portland, Oregon  97034
                                                    503.546.3357

Verified Correct Copy of Original 2/10/2016.

Page 23 - Exhibit 2

16CV03923

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

James Michael Murphy, MD        )
Plaintiff,                       )
                                 )
v.                               )            Declaration
                                 )
Hannah Jolene Dockery-Mosebach   )
Defendant.                       )

Declaration of Hannah Jolene Dockery-Mosebach

I, Hannah Mosebach, am, and at all times relevant to this case have been, a
member of the Air National Guard of the United States Air Force. I am an
Active Guard Reserve (AGR), full-time employee of the Oregon Air National
Guard, presently assigned to 142d FW, Portland Air National Guard Base, as a
Quality Assurance Manager in CPTF/Finance.

As a federal employee, in addition to my job duties as described in my job
description, attached to this declaration as Exhibit 1, one of my responsibilities
is to follow rules and regulations to ensure the proper reporting of sexual
assault to my chain of command. This is expected of me in the regualtions.

On or about December, 2013, I made an unrestricted report of a sexual assault
to Lt Col Walmsley, 142d Wing SARC. I reported an unauthorized "pap smear"
was performed on me during a medical exam that occurred on a drill weekend
when the plaintiff and I were both in a Title 32 military status. The reported
sexual assault occurred while I was on duty at the Portland Air National Guard
Base during November, 2011. The plaintiff is the reported perpetrator.

Major Michael Adams was appointed as my Special Victims' Counsel SVC. He
sent a letter of representation explaining the scope of the SVC program, which
does not include private litigation such as this case, to me on or about Dec 26,
2014. Upon being served with this lawsuit, he also sent me a letter on July 16,
2014 advising me to seek other legal counsel in this matter and that he can
assist me to due to the restrictions of the SVC program.

On or about Dec 27, 2014, I was interviewed by the National Guard Bureau
(NGB) Office of Complex Administrative Investigations (OCI) describing what I
had experienced during my sexual assault. I completed a follow up interview
with NGB OCI on or about May 27, 2014. Major Adams was present. I
understand that the report substantiating or not substantiating the allegation

Exhibit D

EXHIBIT 2

PAGE 1 OF 4

Verified Correct Copy of Original 2/10/2016.

will be finalized and sent to Oregon's Adjutant General in the near future. I made these statements during the interview because it permitted and was my duty as a federal employee and as a member of the Air National Guard to report the specifics of the sexual assault. The OCI investigated the matter.

In the interest of full disclosure, I was given a Letter of Reprimand (LOR) on or about April 6, 2014, for past comments, and to not talk about this case anymore to my co-workers. See Exhibit 2, LOR.

On or about May 22, 2014, I received a phone call from a man who identified himself as "John Shepherd, a private investigator" working for "International Counterintelligence Services, Inc.", short for "ICS, Inc." He lied to me by telling me that he was working for the Oregon Medical Board (OMB) which had outsourced an appeal of a reprimand of an Oregon doctor. He clearly told me that he did not work for the plaintiff. He solicited and I told him, based on his misrepresentation, facts about the reported sexual assault. Based on what I know at this time, this is the investigator referred to in the complaint, and the only person who made recordings that the plaintiff would have access to, because the plaintiff is not privy to the interviews with OCI and OCI has not returned its final report. On or about June 16, my Special Victims' Counsel (SVC), Major Michael Adams, wrote a letter to the Department of Public Safety Standards and Training (DPSST), Private Security/ Private Investigator Licensing Program Office, to complain about this person's misrepresentation. Had I known the truth, that he did not work for the Oregon Medical Board, I would have never made any statements to him.

All of my actions in this matter were within the scope of my official Air Force duties and under color of my office as an AGR/SSgt in the Air National Guard assigned to 142d FW. I acted in the good faith belief that my actions were reasonable and in accordance with the law. My report was based on the honest belief that the sexual assault had occurred during duty hours and rules and regulations needed to be complied with.

I declare under penalty of perjury that the foregoing is true and correct. Signed this ___18___ day of July, 2014, at ___Portland_, ___Oregon_____.

_Hannah Mosebach_

SSgt Hannah Mosebach
Accounting Technician, 142nd CPTF
Portland, OR
Oregon Air National Guard

Verified Correct Copy of Original 2/10/2016.

_Exhibit D_
~~EXHIBIT~~ 2
PAGE 2 0F 4

**From:** Murphy murphmic@gmail.com 
**Subject:** Fwd: Consideration of case
**Date:** November 23, 2015 at 5:46 PM
**To:** cynthmillsm@mac.com

original email
-------- Forwarded message --------
From: RAMIRAB Christopher <Christopher.RAMIRAB@freab.us>
Date: Mon, Aug 31, 2015 at 11:07 AM
Subject: Consideration of case
To: Murphy <cynstrodc@gmail.com>

Dr. Murphy,

I have concluded my review of the potential charges against you as well as the potential charges against Ms. Mossbach. I am declining to issue criminal charges either party Attached is my rejection rationale. I will also provide a copy to Ms. Mossbach through her attorney.

Sincerely,

Chris Ramrea

Confidentiality: This e-mail transmission may contain confidential and/or privileged information. The information contained herein is intended for the addressee only. If you are not the addressee, please do not


Rejection Dr.
Murphy.doc

*Verified Correct Copy of Original 2/10/2016.*

*Exhibit E*

It should be noted that SSgt. Mosebach first reported the incident to Port of Portland Police in January 2015. There is a typographical error in Det. Osario's report that indicates it was January 2014.

-------------------------------------------------------

Legal analysis of Sexual Abuse charges. D denies the conduct and there were no independent witnesses to the potential event. . However, even if we could prove that he performed some type of PAP smear on the victim, such conduct would not prove the necessary elements of Sex Abuse I - III or Unlawful Sexual Penetration I-II.

Sexual Abuse or Unlawful Sexual Penetration in the First Degree both require that the D subject to the victim of "forcible compulsion." There is no allegation by the victim that D used force, in any of its forms, to compel the action she alleges. Unlawful Sexual Penetration II contains an element that the victim be under 14 years of age, and she was not.

Sexual Abuse in the Second Degree does not apply because it requires proof of an element that the victim did not "consent" to the conduct. In this case, the victim states that she consented to having the PAP smear done but would not have if she had known that the ANG no longer conducted them. The fact that she might not have consented if she had more information available to her does not change the fact that, according to her version of the facts, she agreed to have the procedure done. Sexual Abuse in the Third Degree also requires proof of the "consent" element.

The misdemeanor crime of Harassment is closer to what SSgt Mosebach alleges in that it is met when a D intentionally subjects another person to offensive physical contact. It would still be difficult to prove however that the physical contact was offensive at the time it happened. The victim states that it was only after she learned that PAP smears were no longer given that, retroactively, she found the touching offensive. In addition, we cannot meet our burden of proof beyond a reasonable doubt to show that the touching actually occurred. The D adamantly denies it and there is no mention of it in SSgt. Mosebach's medical records. Although a polygraph is not admissible in court, D has passed one with a highly regarded polygrapher. As a final matter, the V sent D a friendly email as recently as September 2013, close to two years after the alleged incident and roughly 3 months before she reported the incident to authorities.

-----------------------------------------

Analysis of Initiating a False Report: Dr. Murphy has asked that Ms. Mosebach be charged with Initiating a False Report. This would require the State to prove, beyond a reasonable doubt, that Ms. Mosebach knowingly filed a false report. We cannot so prove. The ANG substantiated her claim and found her to be credible. Although there are some inconsistencies between her account and other witness accounts concerning the timing of events, she has maintained a fairly consistent account of what occurred. In addition, tools for conducting gynecological exams were located in the room in which Ms. Mosebach says the PAP smear occurred. Although the allegations cannot be proven beyond a reasonable doubt as described above, that does not mean the initial report itself can be proven false beyond a reasonable doubt.

Verified Correct Copy of Original 2/10/2016

This case was originally reported to authorities within the Air National Guard for an allegation of an ANG physician performing an unauthorized PAP smear on an enlisted ANG member during an otherwise regular physical evaluation. The alleged victim, Hannah Mosebach, specifically declined to have the case investigated by local law enforcement. More recently, Ms. Mosebach has asked the Port of Portland to review the case. She is represented by civil attorney Joel Shapiro. I told him a few months ago that I would not be issuing criminal charges for a sexual assault. I did not make a log note at that time however.

Mr. Shapiro has also asked me to look at a potential Perjury charge for Dr. Murphy and Dr. Murphy has asked me to look at a charge of Filing a False Police Report charge against Ms. Mosebach. For the reasons contained in this rejection memorandum, I am declining to issue criminal charges against either party.

-----------------------------------------------------------------

Alleged facts: The following is a brief summary of facts noted in the investigation done by the Port of Portland Police Department as supplemented by an Air National Guard investigation. The reader is directed to those reports for a more detailed account of this incident.

Dr. Murphy is a Lt. Col. in the ANG and had minimal contact with SSgt. Mosebach prior to the alleged incident. (She worked in the Finance department and they had talked in a professional capacity before.) Dr. Murphy performed a 5-year health evaluation of SSgt. Mosebach in November 2011. In December 2013, Ms. Mosebach alleged that he had performed a pap smear upon her and she has subsequently learned that the ANG no longer conducted PAP smears on airmen. She did not say that Dr. Murphy behaved inappropriately other than to conduct the unauthorized procedure.

SSgt. Mosebach states that she first relayed the incident to a friend, SSgt Jaeger, within a month or two of its occurrence but did not report the incident to authorities because she wasn't sure SSgt. Jaeger was correct that the ANG did not do PAP smears. SSgt. Jaeger recalls being told of the incident around August 2013, which would be close to two years after the incident.

SSgt. Mosebach initially did not want to contact local law enforcement after being advised that no criminal charges were likely if she chose to have the ANG conduct an administrative complex investigation. She then changed her mind and reported to the Port of Portland in January 2015.

The Complex Investigation investigator concluded that SSgt Mosebach's assertion was "substantiated" by a Preponderance of the Evidence standard. The investigator cites the victim's emotions, consistency of story and no apparent motive to make it up.

Dr. Murphy adamantly denies the event and has attempted to sue the SSgt. Mosebach for defamation. He passed a polygraph from Carol Miller, a retired PPB polygrapher, stating that he never performed any type of vaginal exam on SSgt. Mosebach. A survey was also done of the 30 other female patients that Dr. Murphy had seen during his tenure as a ANG flight surgeon and, of the 25 that could be reached, all stated that he had never performed a PAP smear or Pelvic exam on them.

Verified Correct Copy of Original 2/10/2016

**Analysis of Perjury charge:**

SSgt. Mosebach alleges that D committed perjury in his response to her "Special Motion to Strike" his defamation suit. Specifically, SSgt. Mosebach points towards several statements in D's pro se response where he claims that the Complex Investigation found " no evidence" to support her claim and that the claim was "completely unsubstantiated". SSgt. Mosebach points out correctly that D made these written assertions after he had received an email from his military defense counsel, Tom Patton, indicting to D that the Complex Investigation had substantiated SSgt. Mosebach's claim.

To prove the crime of Perjury, the State would need to be able to prove beyond a reasonable doubt that Dr. Murphy "knowingly" made a false sworn statement.

In addition to the email sent to Dr. Murphy by his then-lawyer Mr. Patton, there is also evidence as to conversations that Mr. Patton had with Dr. Murphy on this topic that weigh against proving that Dr. Murphy "knowingly" made a false sworn statement.

This writer has reviewed an affidavit submitted by attorney Tom Patton as well as spoken to him. Mr. Patton asserts that Dr. Murphy specifically declined to read the actual Complex Investigation report because there was an order in effect that the findings were to remain confidential and not be released to the public. Mr. Patton specifically told Dr. Murphy that the investigation had found no evidence to corroborate, SSgt. Mosebach's allegation. Although it is impossible to recapture the word-for-word conversation that Mr. Patton had with his client, it is apparent that Mr. Patton disagrees with the conclusion reached by the Complex Investigation and that he conveyed, at a minimum, he did not think that there was evidence sufficient to "substantiate" SSgt. Mosebach's allegation. Since Dr. Murphy had not actually read the report, it is impossible to say whether he "knowingly" misrepresented the finding of the Complex Investigation or whether he believed that there was an "unsubstantiated' finding based upon conversations with his defense attorney. It is this writer's experience that witnesses, victims and clients of defense attorneys frequently do not understand every legal nuance of advice that they are given. As pointed out by Dr. Murphy and Tom Patton, Dr. Murphy is not a lawyer and may well have been confused by the seemingly contradictory messages of the email versus what his attorney told him in a more lengthy conversation.

This writer draws no conclusion as to whether or not Dr. Murphy "knowingly" made a false sworn statement. My conclusion is that we cannot meet our burden of proof to show, beyond a reasonable doubt, that he "knowingly" made such a statement to support a charge of perjury.

Verified Correct Copy of Original 2/10/2016.

Circuit Court of Multnomah County
Civil Division


James Michael Murphy MD


Plaintiff

vs


Hannah Jolene Dockery Mosebach (DOB 8/08/1981)
11611 NE 41st Ave
Vancouver, WA  98686

Defendant


## 1. Facts of the Complaint

On 7 December 2013 the Plaintiff, a physician, was notified in writing by Col Heidi Kjos MD, commander of the medical clinic of the Oregon Air National Guard (ORANG) in Portland, Oregon, that a patient and member of the ORANG had made a verbal complaint and signed a written statement of fact accusing the Plaintiff of performing a PAP smear during a routine screening physical in November of 2011. At the time of the alleged PAP smear the practice was to defer all gynecological exams to the female members primary care or obstetric/gynecologic provider. The patient also alleged that the exam was unchaperoned. The alleged incident could be deemed inappropriate by community medical standards.

The statement by the accuser was and is false and the accuser made it knowingly. The statement constitutes defamation.

The patient who made this false statement has been identified to the Plaintiff as the Defendant, Hannah Dockery Mosebach, an ANG member working at the ORANG base in Portland, Oregon.

The incident occurred in Multnomah County and all individuals involved are Title 32 members (not on federal orders) thus the jurisdiction for this case lies in the Multnomah county court.

## II. Claim for Relief: Defamation

Initial hearings on this complaint resulted in dismissal without prejudice based on SLAPP or ORS 31.150. This dismissal was in error as has been discovered with the examination of the investigative report of the Office of Complex Investigations (OCI), which were only made available to the Plaintiff after his initial filing.

Page 1 of 5

*Exhibit F*

Verified Correct Copy of Original 2/10/2016.

Circuit Court of Multnomah County
Civil Division

The new evidence will show that the only reason the defendant pointed the finger at the plaintiff was that he was the physician that saw her for a physical exam in 2011—he was the one that picked up her chart that day.

The Defendant should not be protected by ORS 31.150 because she has not met the requirements of the statute. Although she made the report in an executive (military) forum, she also made numerous statements outside this forum, both before and after her formal statement.

> The defendant told many people on the base of the incident. Her interview with the OCI clearly reveals this with the statement: "the victim told a lot of people about the incident because it helps her deal with it."

> The defendant continued to tell others about the incident even after she was warned against speaking by her JAG attorney. Defendant in her declaration reveals that she received a letter of reprimand for speaking outside of her chain of command on or about April 6, 2013 for speaking outside of official channels.

> Defendant was contacted by a private investigation service and she spoke to a representative without hesitation, going so far as to make a special appointment to speak in person with an investigator. She willingly and eagerly called the plaintiff a "pervert". She did this while under the impression the investigator was employed by the Oregon Medical Board, no doubt believing that a report made to the Oregon Medical Board would be very harmful to the plaintiff's reputation and could potentially destroy his career and ability to practice. Defendant intentionally did not contact the SVC because she wished to use profanity and make disparaging statements (like calling the Plaintiff a "pervert") and could not do these things in military setting as she would have to uphold a military bearing.

**Plaintiff can demonstrate probability he will prevail on this claim.**

Defendant's statements are inconsistent and inaccurate. Defendant is an unreliable witness and lacks credibility.

> The defendant claimed initially that the plaintiff performed the alleged exam in his exam room. Later she claimed they moved to a different exam room. She changed her claim as she found out the necessary instruments were not available in Plaintiff's exam room, but instead were only found in a single exam room, which then became part of her story.

> While defendant was precise in her memory of some details of the exam, her memory failed abysmally in describing the room stating: "there were two doors but it was the one on the left." This does not match the layout of the clinic. The room where gynecologic instruments were found has a door to the right of MSgt Brian Fredrick's office, which is not an exam room.

> Affidavits from two other physicians working at the clinic will show that such a move would be all but impossible and would be quite unusual and remarkable. It is inexplicable that Col Kjos, MD stated to the OCI that moving patients from one room to another was neither unusual nor difficult.

> Defendant has little to no specific memory of the examination. Yet she has clear and specific memories of other events occurring over the same time period involving Plaintiff.

Page 2 of 5

Verified Correct Copy of Original 2/10/2016

Circuit Court of Multnomah County
Civil Division

In medical reporting in both self assessments and to health providers, Defendant failed to report the alleged exam and PAP smear. In numerous health self assessments she reported having had PAPs performed in 3/2004, 5/2009, and 7/2012. Defendant never reported the alleged exam and PAP in any self report or during visits to any clinic.

Defendant reported she told her friend SSgt Tess Jaeger, about the incident shortly after it occurred. SSgt Jaeger stated she only heard about the alleged incident in 2013, two years later. The defendant never called to request the results of the PAP smear she alleges was performed. If she believed it to be legitimate, why did she not call for results? If she believed it to be illegitimate and an assault, why did she wait two years to report it?

The defendant never called to request the results of the PAP smear she alleges was performed. If she believed it to be legitimate, why did she not call for results? If she believed it to be illegitimate and an assault, why did she wait two years to report it?

The OCI investigation found the Defendant's statements were substantiated. A close examination of the report provided shows the investigation is riddled with errors and shortcomings. Plaintiff must conclude the OCI was unduly influenced by a political climate with the result of making the military extremely sensitive to the plight of victims of sexual assault to the point of giving credibility to incredible claims. While this is an admirable position to take, the result is the creation of another class of victims: the falsely accused.

**Shortcomings in the OCI investigation as revealed in the report include:**

The investigators failed to question the clinic manager Chief Eddings who was manager of the clinic at the time of the alleged incident, nor did they interview Col. Lloyd who was the Clinic Commander ( Col Lloyd ) at the time of the alleged exam in 2011.

They received the details of the PHA process from TSgt Albright who is not a medic or nurse (she does hearing evaluations on PHA days) as opposed to MSgt Fredrick who has run the process for years.

The investigators failed to question Defendant about why she neglected to report to the military that she had been taking psychotropic medications for years.

The investigators failed to question Defendant about lying about tobacco use to the military for years.

OCI investigators failed to obtain medical records directly from providers. There is no record in the OCI report of why or when the defendant was put on or taken off her psychotropic medications. No records of current medications and no records of who is currently managing the defendant's depression / anxiety which has never been noted in military records in spite of the defendant being on medication since at least 2006 per medical history reported to her optometrist.

OCI report depends heavily on the statement of Col Heidi Kjos. Many of Col Kjos's statements are inaccurate, including her saying that moving between exam rooms was usual, that several

Page 3 of 5

Verified Correct Copy of Original 2/10/2016.

Circuit Court of Multnomah County
Civil Division

patients stated Plaintiff was "creepy" when most of these patients said the interview was "creepy" and the two(?) patients who did call the Plaintiff creepy had heard the allegations.

**The defendant's interviews and reports do not support a witness who demonstrates credibility.**

The defendant denies tobacco use to the military consistently but reports tobacco use to private health care providers.

The defendant fails to report to the military that she has been continuously taking psychotropic medications including: zoloft or sertaline, bupropion or Wellbutrin, Lorazapam or Ativan. She fails to report it to the military in spite of an obligation to do so.

Defendant has a history of arrest for domestic violence.

In her statements to the OCI and in text messages prior to her reporting the alleged incident the defendant voices concerns about becoming the object of a defamation suit, a suit made on the basis of false claims made knowingly.

Defendant's actions toward Plaintiff were inconsistent. She continued to act in a friendly and even welcoming manner toward the Plaintiff after the alleged event and even after she had reported it. She expressed concern when the Plaintiff, while in conversation with another ORANG member, did not engage her in conversation, asking at the time if the Plaintiff had been informed that she was the ORANG member who had made the report of misconduct. After *not* encountering the Plaintiff when he made a trip (on orders from Col Kjos) her offices she requested Plaintiff be served with a restraining order.

These facts are the result of a close examination of the OCI report, a private investigation and interviews with ORANG members of his acquaintance and affidavits provided by two such witnesses. Plaintiff is sure further evidence will be provided if he is allowed discovery via depositions of other witnesses including Jeff Hwang, Heidi Kjos, Michele Marshall, Brian Fredrik, Rachel Albright, Jessica Riley and Tess Lorraine Jaeger.

In contrast, Plaintiff is described in the OCI report as having "a good reputation and was credible during an interview with the investigative team." Nor did the report cite any inconsistencies or any evidence to support a lack of credibility on the part of the Plaintiff. There were no reports of similar incidents from any other female patients in the ORANG. The OCI investigators noted that it is "absurd that a reputable physician would risk his medical license, military and civilian career and livelihood by performing the unauthorized PAP exam."

**III. Prayer for Relief**

Special Damages and Non- Economic Damages

Page 4 of 5

Verified Correct Copy of Original 2/10/2016.

Circuit Court of Multnomah County
Civil Division

Since the Oregon National Guard is composed of citizen soldiers (members of the local community), the defendant's defamatory statements regarding a physician have the potential to propagate throughout the general community and cause harm to the plaintiff's reputation outside the military base. This has the reasonable expectation of significantly diminishing the plaintiff's employment opportunities and future earnings. The reaction of the Plaintiff's military supervisors to the false allegation and defamatory statements has already caused the plaintiff significant special damages through denial of training and deployment opportunities. The plaintiff is seeking $ 200,000 plus legal fees and court costs in special damages based on calculated losses that have already occurred and financial losses that are likely to occur as a result of the Defendant's defamatory statements.

The Plaintiff has also suffered non-economic damages from mental anguish, emotional distress, anxiety causing damage to interpersonal and professional relationships. The defendant's defamatory statements have caused personal shame and impairment to the plaintiff's reputation and standing in the medical community. An investigation regarding the false accusation has proceeded for over 6 months exacerbating the emotional and financial distress. The plaintiff is seeking $100,000 in non-economic damages . Assuming a judgement in favor of the Plaintiff, the Plaintiff will seek collection by placing liens on any and all real property owned by the defendant and her spouse as well as garnishing the defendant's military wages and future earnings until the debt is paid in full. Plaintiff is seeking a total of $300,000 plus legal fees and court costs .

----------------------------------------------------------------------------
============================================================================

I certify that the above is true and correct to the best of my knowledge under penalty of perjury . I will have the Defendant served with the complaint within 14 days . Respectfully Submitted ,

James Michael Murphy MD , 10 JUNE 2014

Verified Correct Copy of Original 2/10/2016.

Page 34 - Exhibit 2



**DEPARTMENT OF THE AIR FORCE**
142d FIGHTER WING (ACC)
PORTLAND AIR NATIONAL GUARD BASE OREGON

6 April 2014

MEMORANDUM FOR RECORD

FROM:  142 CPTF/CC

SUBJECT:  Letter of Reprimand for Failure to Follow a Direct Order and Unprofessional Conduct

1. This memorandum constitutes notice of a formal reprimand for a violation of your failure to follow direct orders, as well exhibiting unprofessional behaviors which are not conducive to good conduct and order in a military organization. The specific reasons are outlined in the following paragraphs.

2. Failure to Follow Direct Orders:

    a. On Monday, 30 December 2013, Wednesday, 15 January 2014, and again on Friday, 4 April 2014 I advised you to exercise discretion with respect to discussing an active, on-going investigation related to allegations made by you against another member of the 142d Fighter Wing. My counsel was specifically provided to protect you from further repercussions in the event the accused became aware of your extraneous conversations and chose to pursue legal, civil recourse against you.

    b. On Monday, 13 January 2013 it was brought to my attention by a CPTF member that you had personally shared with them the circumstances surrounding your legal case, to include the name of the accused. Further, they indicated you have openly discussed this in the work center with others on numerous occasions. On 15 January 2014 I asked you directly if you had discussed this in the work center and you indicated you had not, which was later confirmed to be untrue.

    c. On Wednesday, 22 January 2014 you attended a mentoring meeting with a Senior NCO in the Operations Group. During this meeting you divulged details of your case to this individual, again to include the name of the accused, which resulted in the member reporting this up the chain of command, ultimately to the Wing Commander.

    d. On Friday, 4 April we had a meeting to discuss upcoming force management moves within the unit. During this meeting you stated that you intentionally accessed the records of the member named in your legal case to determine the current duty status of the member. You have violated your position as a trusted agent in this organization by using your professional position for self-serving gain. You also stated that you had spoken with an individual, who is your personal acquaintance, in the accused member's unit about the current status of the member's affiliation with the organization. Again, this was a violation of privacy and abuse of your personal relationship with that unit member.

Verified Correct Copy of Original 2/10/2016.

Exhibit G.

3. Recent examples of unprofessional conduct or behavior that is not conducive to unit morale and good discipline:

    a. Paragraphs a. through d. above represent a pattern of behavior in direct conflict with maintaining organizational order and discipline. Further, these discussions have created a tense and awkward work environment.

    b. On Friday, February 28, 2014 you were part of an interview board for a vacancy in our unit. During this process you exploited your role as a board member by using it as an opportunity to "warn" the applicant that he should be wary of future promotion potential in this unit based on your perception of untimely promotions of other unit member, who you went on to identify by name. In a follow-up conversation with the applicant's supervisor the following day you were defensive and dismissive of his concern over your comments made to his subordinate the previous day.

    c. On Friday, 4 April, 2014, in the same meeting referenced in 2d. above, you made known your disagreement with the decisions made by the CPTF leadership team related to our hiring plan for a current vacancy in the office, citing it as "unfair". While we had closed the meeting with a plan to reconvene and discuss further, you elected to again demonstrate a lack of judgment and maturity by engaging in a conversation with co-workers out in the middle of the work center floor divulging the details of the conversation we had—asserting your "pride in sticking up for yourself"—once again publicly airing your grievances in the work center and further conveying the perception of unfair treatment.

4. On numerous occasions throughout the investigative process of your allegations I have stated my desire to ensure your rights and privacy are protected. I have also advised you that while we work through this process, you needed to be cognizant of not only the potential repercussions to you personally, but to the investigative process, if you continue to reveal details to those who do not have a need to know. While I have an obligation to you as member in my unit, I also have an obligation to protect the organization as you have deliberately violated a direct order to maintain confidentiality and discretion throughout this process.

5. Given the sensitivity of the allegations surrounding your case, and recognizing the undue stress this has put on you, I have given deference to your behavior for fear of putting further stress on an already tenuous situation. However, in light of your continued pattern of poor judgment and lack of professionalism related not only to discussing your case—despite my order not to—combined with your unprofessional conduct in the work environment, this will no longer be tolerated. You are hereby reprimanded.

6. PRIVACY ACT STATEMENT. AUTHORITY: 10 USC 8013. PURPOSE. To obtain any comments or documents you desire to submit for consideration concerning this action. ROUTINE USE: Provides you an opportunity to submit comments or documents for consideration. If provided, the comments or documents you submit become a part of the action. DISCLOSURE: Your written acknowledgement or receipt and signature are mandatory. Any other comments or documents you provide are voluntary.

Verified Correct Copy of Original 2/10/2016

7. You will indicate receipt and understanding of this letter in the space below. Your signature does not imply agreement or disagreement. You have 3 duty days in which to provide a response if you choose. A response is not required.

JENIFER E. PARDY, Lt Col, ORANG
Commander

To: 142d CPTF/CC

Receipt acknowledged at _____ hours, on _____ April, 2014.

I understand that I may submit a response within three duty days.

HANNAH R. MOSEBACH, SSgt, ORANG

Verified Correct Copy of Original 2/10/2016

From: Murphy <murphmic@gmail.com>
Subject: shapiro approval of making the 274pg part of court record
Date: February 4, 2016 at 9:48:23 PM PST
To: "cynthmillsm@mac.com" <cynthmillsm@mac.com>

oel@joelshapirolaw.com <joel@joelshapirolaw.co 11/19
                                                 /14
m>

to me, Tiffany.A.FOX

Ms. Fox & Dr. Murphy,

I have no objection to Judge Matarazzo receiving the entire 274-page OCI
report.  As Dr. Murphy presumes, I was provided with and reviewed the
entire OCI report for the official purpose of representing the facts to the
court and serving as counsel to my client in this matter.  I would make one
note of clarification:  I believe Dr. Murphy means that the version provided
to the court was excerpted, rather than edited.

Although I cannot speak for Maj. Adams, I do not believe that Exhibits 3 - 5
from the OCI report, which were submitted as part of Maj. Adams' Affidavit,
contained any edits.  I certainly don't believe there is anything in the
additional portions of the report that is more relevant than the portions
submitted by Maj Adams, nor that would contradict the conclusion in
the summary, as submitted, that Defendant Mosebach was found by the
OCI investigators to be credible, and that her allegations were
"substantiated."  However, I have no objection to the full report being
submitted to the court, nor to the Plaintiff's request to amend his Motion to
include observations based on the full report.

Secondly, if Judge Matarazzo wishes to hold a hearing on the Plaintiff's
Motion, I have no objection to waiting until Dec. 18th or later.  However, I
will likely be gone for an extended period of time over the holidays, and
may not be available during the weeks of Dec. 22nd and Dec. 29th.

Regarding, more generally, the request for a hearing on Plaintiff's Motion

Verified Correct Copy of Original 2/10/2016.

Exhibit I

to Vacate the Order or Amend the Findings, I would note for the court that the Motion does not assert grounds for relief from an Order pursuant to ORCP 71. ORCP 71 provides for relief based on: clerical mistake, mistake, inadvertence, surprise, excusable neglect, newly discovered evidence which by due diligence could not have been discovered in time, fraud, misrepresentation, or other misconduct of an adverse party. Here, the Plaintiff is asserting that an error of law was made by the court. The proper venue for such an assignment of error is the appeal of a judgment to an appellate court. Because a judgment has not yet been entered in this case, the Defendant would submit that Plaintiff's Motion is not yet ripe, nor made in the proper venue.

Finally, related to the schedule of remaining procedural steps in the case, pursuant to ORCP 68, tomorrow the Defendant will submit a statement for costs, disbursements, and attorney fees. I also also anticipate requesting an administrative addition to the record.

Sincerely,
Joel Shapiro

Law Office of Joel Shapiro
1420 NW Lovejoy Street, Suite 631
Portland, OR 97209
503-222-1507

Verified Correct Copy of Original, 2/10/2016.

Page 39 - Exhibit 2

*Exhibit J.*

| PORT OF PORTLAND POLICE DEPARTMENT | GENERAL OFFENSE | | PAGE OF 1/2 |
|---|---|---|---|

| CASE NUMBER 14-451832 | REFER CASE NUMBER(S) | CLASSIFICATION | CLR |
|---|---|---|---|

| DATE/TIME REPORTED 12-18-2014 1035 | DATE/TIME OCCURRED (START) 11-19-2011 1200 | DATE/TIME OCCURRED (END) |
|---|---|---|

**LOCATION OF OCCURRENCE**
6801 NE CORNFOOT BUILDING #250

**PREMISE TYPE**
28 MILITARY FACILITY

**OFFENSES**

| OFFICERS OFFENSE 1199 - SEX ASSAULT-OTHER | CRIMINAL ACT | FORCE | WEAPON |
|---|---|---|---|

**PERSON - SUSPECT**

| NAME (last, first middle) MURPHY, JAMES | | CRN | | SEX M | RACE U | DOB 10-06-1957 (57) |
|---|---|---|---|---|---|---|

| HOME ADDRESS | CITY | STATE | ZIP | HOME PHONE |
|---|---|---|---|---|

| EMPLOYER ADDRESS | WORK PHONE (503)705-7425 | HGT | WGT | HAIR | EYES | MOBILE PHONE |
|---|---|---|---|---|---|---|

OTHER INFORMATION (Person Details, Linkage Factors, etc.)

**PERSON - VICTIM**

| NAME (last, first middle) MOSEBACH, HANNAH | | CRN | | SEX F | RACE | DOB AGE 32 |
|---|---|---|---|---|---|---|

| HOME ADDRESS | CITY | STATE | ZIP | HOME PHONE (360)359-1269 |
|---|---|---|---|---|

| EMPLOYER ADDRESS | WORK PHONE (503)335-5410 | HGT | WGT | HAIR | EYES | MOBILE PHONE |
|---|---|---|---|---|---|---|

OTHER INFORMATION (Person Details, Linkage Factors, etc.)
VICTIM OF SEX ASSAULT-OTHER    VICTIM WAS ACQUAINTANCE

**NARRATIVE**    REPORTED BY: 20562    DATE/TIME REPORTED: 12-18-2014 1055

On 10-29-2014 I received a phone call from Dr. James Murphy who identified himself as being a doctor at the Air Base. Murphy stated that being a doctor he is a mandatory reporter of any sexual assault that he knows about. He said that he talked to his Attorney who advised him to call the police. Murphy said that he had heard that a sexual assault may have occurred in the medical building on the Air Base on 11-19-2011.

Murphy stated that the victim was Hannah Mosebach who works in Finance on the Air Base. Murphy told me that I needed to talk to Dr. Hedi Kjos who is also a doctor at the Air base for further information. Murphy did not tell me that he was the subject of the investigation and I thought he had received the information third hand.

I called Kjos and told her what I was calling about who referred me to the Base Commander Richard Wedan.

Wedan stated that a complaint was filed with the Air Base regarding an Alleged Improper Medical Procedure that occurred on 11-19-2011. Wedan said that an investigation was completed and that they were now in the Administrative Phase. When I asked about the military investigative process he explained that it first went to OSI, Office of Special Investigation, who did not do the investigation. The information then went to the FBI who refused to take it. The complaint then went to the Office of Complex Investigation which falls under the National Guard. Wedan said that in order for this type of investigation to occur the victim has to agree to it and refuse any involvement by local law enforcement, which is what happened.

| REPORTING OFFICER(S) / DPSST RECTOR, BRUCE P (20562) | PREC/DIV PATROL | #30017 |
|---|---|---|

BEGIN PPDS DATA ENTRY GO#USP    SUBMIT DATE/TIME 12-24-2014  1110    CASE NUMBER 14-451832    v.141107

*Exhibit J.*

Verified Correct Copy of Original 2/10/2011

| PORT OF PORTLAND POLICE DEPARTMENT | GENERAL OFFENSE | PAGE OF 2/2 |
|---|---|---|

On 11-19-2014 I received a phone call from Dr. Terry Lewis with the State Medical Board. Lewis stated that he was calling regarding Dr. Murphy. Lewis told me that Murphy had stated that he reported a possible sexual assault to me. I told Lewis that he had and I gave him the date he called, which was 10-29-2014. Lewis then stated "I am sure Murphy told you that he was the subject of the report". I told Lewis that Murphy never stated that he was the subject of the report. I took what he said that he learned of the incident third hand. Lewis requested a copy of the CAD call showing when Murphy called our department. I told him the procedure of how to do that.

On 12-16-2014 I received a phone call from Col. Marty Wilde who stated that he was calling regarding the James Murphy investigation. He said that he had been in contact with the DA's Office and talked to DA Chris Ramis who is with the Sex Crimes Unit. Wilde told me that he learned that he should have notified us of the investigation at the beginning. He said that he wanted to send me the report and asked for my email address which I gave to him. I received the report and forwarded it to Detective Tim Osorio

Verified Correct Copy of Original 2/10/2016

| REPORTING OFFICER(S) / DPSST RECTOR, BRUCE P (20562) | | PREC / DIV PATROL | |
|---|---|---|---|
| REGJIN PPDS DATA ENTRY GOF/USF | SUBMIT DATE/TIME 12-24-2014  1110 | CASE NUMBER 14-451833 | ~r 141107 |

## Port of Portland Police Department

SP# 43 2014-451832                  SUPPLEMENTAL                  REPORTED BY 44432

| SUPPLEMENTAL | 14451832 | 12/29/2014 | 44432 |

## Supplemental Information

> Reported On  12-29-2014
> Submitted By  OSORIO, TIMOTHY B (44432)          Assignment  DETECTIVES

## Related Person(s)

### 1. SUBJECT #1

Name  MOSEBACH, HANNAH                        Adult   (AGE 33)
Sex  F                        Race U          Date Of Birth  08-08-1981

**LINKAGE FACTORS**

Resident Status  NONRESIDENT
Age Range  K - 30-49 YEARS

### 2. SUBJECT #2

Name  MURPHY, JAMES M                        Adult   (AGE 57)
Sex  M                        Race U          Date Of Birth  10-06-1957

**LINKAGE FACTORS**

Resident Status  NONRESIDENT
Age Range  L - 50-64 YEARS

## Related Text Page(s)

### 1. NARRATIVE

Author  OSORIO, TIMOTHY B (44432)          Date/Time  12-29-2014
Subject  FOLLOW UP INVESTIGATIONS

I was informed that Ofc. Bruce Rector with the Port of Portland Police had been contacted regarding a possible sexual assault that had occurred at the Oregon Air National Guard base (Refer to Ofc. Rector's report for details).  On 12/22/2014 Sgt. Greg Buddrius and I met with Colonel Richard W. Wedan at the Oregon Air National Guard to discuss the mentioned incident. Col. Wedan provided us with a summary of the investigation conducted by U.S. Air Force. Col. Wedan stated that the mentioned incident had occurred in 2011 and that the allegations had been reported by a Hannah Mosebach, who is currently in the Air National Guard. The other

## Port of Portland Police Department

SP# 43 2014-451832                    **SUPPLEMENTAL**                  REPORTED BY 44432
RELATED TEXT - NARRATIVE

party involved in this incident had been identified as James Murphy, who also is currently in the Air National Guard. Col. Wedan stated that Ms. Mosebach had declined to involve local law enforcement to conduct the investigation for this case, and instead had requested that the investigation be conducted by the U.S. Air Force, Office of Complex Investigations. Col. Wedan informed us that the investigation into this incident had been completed, and that they were in the administrative phase of the case. I would like to note that to this date, neither myself or any other officer with the Port Police Department, has been contacted by the alleged victim in this case, identified as Hannah Mosebach.

Furthermore, based on the information we received from Col Wedan it appears this incident has been investigated by the U.S. Air Force at the request of Ms. Mosebach (See attached letter acknowledging this request by Ms. Mosebach).

*** END OF HARDCOPY *** v.140801

Verified Correct Copy of Original 2/10/2016.

For OSORIO, TIMOTHY B    Printed On 12-30-2014  0910                                Page 2 of 2

## Port of Portland Police Department

| | | |
|---|---|---|
| SP# 43 2014-451832 | **SUPPLEMENTAL** | REPORTED BY 44432 |

| SUPPLEMENTAL | 14451832 | 01/19/2015 | 44432 |
|---|---|---|---|

## Supplemental Information

| |
|---|
| Reported On 01-19-2015 |
| Submitted By OSORIO, TIMOTHY B (44432)      Assignment DETECTIVES |

## Related Person(s)

### 1. SUBJECT #1

| | | |
|---|---|---|
| Name MURPHY, JAMES | | Adult (AGE 57) |
| Sex M | Race U | Date Of Birth 10-06-1957 |
| Phone    Cellular (503) 705-7425 | | |

**LINKAGE FACTORS**

Resident Status NONRESIDENT
Age Range L - 50-64 YEARS

### 2. RPTG PARTY #1

| | | |
|---|---|---|
| Name MOSEBACH, HANNAH J | | Adult (AGE 33) |
| Sex F | Race W | Date Of Birth 08-08-1981 |
| Address 11839 SE RIVERRIDGE DRIVE, VANCOUVER, WA 98683- | | |
| Phone    Home (360) 553-2765 | | |

**LINKAGE FACTORS**

Resident Status NONRESIDENT
Age Range K - 30-49 YEARS

## Related Text Page(s)

### 1. NARRATIVE

Author OSORIO, TIMOTHY B (44432)      Date/Time 01-19-2015 1037
Subject FOLLOW UP INTERVIEWS

On 01-16-2014 I met with Hannah Mosebach at the Port of Portland Police Department and took her statements. Prior to the mentioned meeting, I had cotacted Ms. Mosebach and inquired if she wanted to file a complaint regardig an incident that had occurred at the Air National Guard Base

Page 44 - Exhibit 2

## Port of Portland Police Department

| SP# 43 2014-451832 | SUPPLEMENTAL | REPORTED BY 44432 |
|---|---|---|

**RELATED TEXT - NARRATIVE**

(Refer to Ofc. Rector's report). She advised me that she indeed wanted to file a complaint with our agency.

Ms. Mosebach agreed to meet with me at the Port of Portland Police Department where I took her statements. I informed Ms. Mosebach that our interview was being recorded and that it was a crime to file a false police report. I proceeded to explain to Ms. Mosebach how our agency had been contacted regarding her reported sexual assault that had occurred at the Air National Guard Base. I informed her that I had met with members of the Guard Base to discuss the investigation that had been conducted on their part regarding this matter, and that I had been informed that she had requested that law enforcement not be contacted when the investigation began. I also informed Ms. Mosebach that I had been contacted by an attorney, who identified himself as Joel Shapiro, who was representing her in a civil matter associated with this matter, who stated he believed that the suspect in this case, identified as James Murphy, had also committed the crime of perjury and he had evidence to provide on that matter. I asked Ms. Mosebach to tell me what had occurred at the Air National Guard Base, located 6801 NE Cornfoot Rd in the city of Portland, County of Multnomah, on approximately November of 2011.

Ms. Mosebach stated she was currently assigned at the Oregon Air National Guard base and that on the mentioned date she had reported to the base to have her five (5) year PHA (Physical Health Assessment) at the base. She stated once she arrived she observed Mr. Murphy in the waiting room who was conducting the mentioned health assessments. Ms. Mosebach stated that Mr. Murphy took her file and proceeded to conduct the physical health assessment in one of the screening rooms. Ms. Mosebach stated Mr. Murphy asked the normal questions during the assessment. She stated he then asked her when was the last time she had a "PAP" smear done on her. She told him that the last one she had done was when her son was born in 2009. Ms. Mosebach stated that Mr. Murphy told her that she was due for one. She stated that Mr. Murphy asked her "Do you want to do one here while you are here", to which she replied "sure". Ms. Mosebach said she had a civilian doctor but thought she might as well get it done and out of the way.

Ms. Mosebach stated Mr. Murphy agreed to do the procedure, and that they switched rooms. Ms. Mosebach stated she remembered distinctly what room they proceeded to, since it was "on the left side". Ms. Mosebach said she could not remember what the reason was to switch rooms, but that she had no reason not to trust him (Murphy). Ms. Mosebach stated that Mr. Murphy then said to her "You don't need a female in here do you?" Ms. Mosebach told me that she felt obligated or inclined to say "No, that's fine". She stated that the way Mr. Murphy asked her that question stood out to her since she had never had a doctor ask her that, in that manner.

Ms. Mosebach told me that Mr. Murphy then conducted a PAP smear and that it seemed like a normal PAP smear to her, except that when she left she recalled that" it did not hurt" and she thought to herself that "He must be good at it". Ms. Mosebach identified Mr. Murphy as James Murphy, and stated he worked at the medical building at the base.

I asked Ms. Mosebach if she remembered what day of the week this had happened. She stated "Saturday". Ms. Mosebach told me that she did not remember at what time this had occurred, but that she could retrieve that information from her work calendar. I confirmed with Ms. Mosebach that this assessment had been scheduled through the Air National Guard, which she replied it had. She told me that this health assessment was conducted every five (5) years. Ms. Mosebach then told me "In my defense, I though PAP smears were performed there because I had actually

For OSORIO, TIMOTHY B    Printed On 02-17-2015  1015                                    Page 2 of 7

Page 45 - Exhibit 2

**Port of Portland Police Department**

SP# 43 2014-451832                              **SUPPLEMENTAL**                       REPORTED BY 44432
RELATED TEXT - NARRATIVE

had one there before, in the beginning of my military career". Ms. Mosebach stated she believed Mr. Murphy noticed this in her file, and that is why he asked her about it. She added "How was I supposed to know he wasn't supposed to do it".

I had Ms. Mosebach confirm the location of where this procedure took place. She stated it happened in the Medical Building on the base, located at the Air Nation Guard Base adjacent to the airport. I asked Ms. Mosebach if she had been assigned or scheduled to see Mr. Murphy for her health assessment. She stated she did not know, or had prior knowledge of who would be seeing her to conduct the assessment. Ms. Mosebach stated that she had met Mr. Murphy about a year before this incident took place, and that she knew him. She stated that Mr. Murphy would always "chit-chat" with her and her friend "Tess". Ms. Mosebach mentioned that once she observed Mr. Murphy at the medical building when she arrived for her assessment, she thought to herself that she would be able to cut in front of other people in the waiting room since she knew Mr. Murphy was conducting the assessments.

I asked Ms. Mosebach how many Physical Health Assessments she had taken at the Air National Guard Base. She stated she did not really know, but believed she had taken one more in addition to the one she was talking about. I asked her how long she had been associated with the Air National Guard. She stated "It will be thirteen years in March".

I asked Ms. Mosebach if on the date this incident took place, she had checked in at the facility prior to seeing Mr. Murphy. She stated she had. She said that after Mr. Murphy had contacted her in the waiting room, he had escorted her to an exam room. She stated that there was no staff or other personnel in the exam room. I asked Ms. Mosebach if she recalled what happened or transpired when Mr. Murphy started the health assessment. She stated that he asked the regular medical questions, but that she did not remember what the questions were. Ms. Mosebach stated it was routine medical questions. She stated that Mr. Murphy then asked her about the PAP smear, which seemed normal to her. She added that every year she needed to complete a medical questionnaire, and that one of the questions asked in the questionnaire is when was your last PAP smear conducted. I asked her about the duration of the initial interaction she had with Mr. Murphy when he started the assessment and prior to the discussion about the PAP smear. She stated she recalled it as a normal amount of time. Ms. Mosebach told me that Mr. Murphy was reviewing her chart when he asked her when was the last time she had a PAP smear. She stated that Mr. Murphy then told her that she was due for one. She stated that after the incident took place, she did some research and discovered she was not due for a PAP smear at the time Mr. Murphy asked about it, but she did not know this information at the time it happened.

Ms. Mosebach stated again that after Mr. Murphy had told her that she was due for the mentioned procedure, he asked her if she wanted to have the procedure conducted on her on that date, which she stated she did. I asked her if Mr. Murphy had told her why they needed to move to another room to conduct the procedure. She stated that he had given her an explanation of why they needed to move, but she did not remember what the explanation was. She added that at the time she had no reason to question Mr. Murphy on why she needed to go to a different room for a PAP smear.

I asked Ms. Mosebach to describe what Mr. Murphy had stated to her regarding having another person present during the procedure. She stated that Mr. Murphy had told her "You don't need a female in here do you?" She stated that she felt Mr. Murphy was making it awkward for her to say "yes" to having a female present in the exam room. Ms. Mosebach told me that she did want a

## Port of Portland Police Department

SP# 43 2014-451832                          SUPPLEMENTAL                          REPORTED BY 44432
RELATED TEXT - NARRATIVE

female present in the room, but that she told Mr. Murphy that she did not need one. I asked Ms. Mosebach to describe where the exam room that Mr. Murphy had escorted her to conduct the PAP smear was located in connection to the room she had done her initial assessment. She stated she believed it was down a different hallway, but still in the medical building at the vase.

I asked Ms. Mosebach to tell me what happened once she arrived at the exam room where she was escorted by Mr. Murphy. She told me that she did not really remember what happened when they got to the room. She stated she knew she had to remove her pants and underwear. Ms. Mosebach told me she remembered that the top part of her body and chest was covered with her military blouse or something else. I asked Ms. Mosebach if she recalled if Mr. Murphy had said anything to her prior to initiating the PAP smear procedure. She told me she did not remember. She did state that she remembered that Mr. Murphy retrieved some tools for the exam from a shelf in the exam table.

I asked Mr. Mosebach to tell me where Mr. Murphy was located when he began the procedure. She stated that she was lying on an exam table and that Mr. Murphy was seated at the foot of the table by her feet. I asked Ms. Mosebach if she could see Mr. Murphy while he was seated. She stated she could. I asked Ms. Mosebach if she had seen Mr. Murphy take out the tools from the shelf in the exam table. She stated she had not. I asked her if she remembered what happened once Mr. Murphy began the procedure. She told me that she remembered the "feeling of lube", but not lubrication being rubbed on her. She stated she remembered "things being put in". I asked her if Mr. Murphy had said anything to her while this was taking place. She stated she did not remember that. I asked her if Mr. Murphy had stood up or moved around once the procedure began. She stated he had not. I asked her if Mr. Murphy had removed any clothing items while he conducted the procedure. She stated he had not. I asked her if Mr. Murphy had stated anything to her once the procedure was done. She stated she did not remember.

I asked Ms. Mosebach how long she thought the procedure lasted. She stated "I wasn't five minutes and it wasn't thirty minutes". She told me it was what a normal PAP smear takes. She stated she thought it was maybe ten or fifteen minutes. I asked her if there was anything out of the ordinary from that procedure that she recalled. Ms. Mosebach told me that she did not feel anything weird during the procedure. She stated she remembered that it did not hurt. I asked her if she remembered if Mr. Murphy stepped out the exam room once he was done. She stated the Mr. Murphy was not in the exam room when she undressed prior to the procedure, and when she was putting her clothes back on after the exam. I asked Ms. Mosebach if Mr. Murphy had said anything to her once the examination was complete and she had put her clothes on. She stated she did not remember. Ms. Mosebach stated that once she put her clothes on, she departed from the medical building. I later asked Ms. Mosebach if when she said "things being put in her", she meant in her vagina. She stated yes. I asked her if she observed Mr. Murphy place his finger(s) inside of her vagina. She stated she did not see that. Ms. Mosebach stated she was not looking at Mr. Murphy's hands while he was conducting the procedure, but that it felt like a normal PAP smear procedure.

I asked Ms. Mosebach if she remembered the date she had a PAP smear examination prior to the one she was reporting from 2011. She said she thought it was in 2004, and that it took place at the same medical building on the Guard base. Ms. Mosebach stated she did not remember who performed that procedure in 2004. Ms. Mosebach stated she had an additional PAP smear conducted by her civilian doctor after 2004. I asked Ms. Mosebach if there were any differences she recalled from the procedure conducted by Mr. Murphy in 2011 to the ones that happened prior

# Port of Portland Police Department

SP# 43 2014-451832                              **SUPPLEMENTAL**                         REPORTED BY 44432

RELATED TEXT - NARRATIVE

to that. She stated that during the procedure conducted by Mr. Murphy, she recalled that it did not hurt and she believed that a sample had not been taken. Ms. Mosebach stated that in the prior procedures when a sample was taken, she recalled it was painful. Also, she stated that she had never had a male doctor say "You don't need a female here do you?" I asked her if she recalled having a female present when she had the procedure conducted on her in 2004 at the Guard base. She stated she did not remember. Ms. Mosebach did state that a female was present when she had the procedure performed on her by her civilian doctor.

I asked Ms. Mosebach to tell me what took place after the procedure occurred. She told me that she recalled telling her friend "Tess" what had happened. I asked her if she recalled when she had talked to Tess about this. She told me that she did not remember the exact date, but believed it was close to when the procedure took place. She stated she was riding in Tess' vehicle and that she disclosed the procedure to her friend since she thought it was gross. I asked her to elaborate more on that. She told me that since both she and Tess knew Mr. Murphy, it was gross that Mr. Murphy had seen her naked and she felt weird. She stated that Tess told her that they did not conduct PAP smears at the base anymore. Ms. Mosebach stated she replied to Tess that Mr. Murphy had conducted a PAP smear on her and that either the procedure was still taking place at the base, or that Mr. Murphy was "a dirty old man". I asked her what her relationship with Tess was. She stated that Tess was a good friend and that she also worked at the Guard base with her. I asked her if she knew why Tess believed that PAP smears were not conducted at the base anymore. She stated she did not know. I asked Ms. Mosebach if she had told anyone else about the procedure. She stated she had told her husband. I asked her what made her discuss the matter with her husband. She stated she told him because it was "weird" since she knew Mr. Murphy.

Ms. Mosebach told me that she had also discussed the matter to another person two years after the incident took place. She stated that she had attended a "Non Commission Officers Academy" in Tennessee on approximately December 2013, where she met Rachel Albright who was also attending the training. Ms. Mosebach stated that she disclosed to Rachel that Mr. Murphy had conducted a PAP smear on her and that she felt weird since he asked her "you don't need a female here do you?" Ms. Mosebach stated that Rachel told her that PAP smears were not conducted anymore, and that the procedure had been discontinued for the last nine years. Ms. Mosebach stated that Rachel contacted the medical building in Portland, OR where the procedure had taken place and requested to review the medical records of Ms. Mosebach, to see if the procedure had been documented. Ms. Mosebach stated that she wanted to know if the procedure had been documented, since if it was not recorded, she felt it vindicated her feeling that Mr. Murphy was a "pervert". Ms. Mosebach stated that she was advised by phone that per her medical records, the last time she had a PAP smear documented in her record was 2004. Ms. Mosebach stated she replied "That's so fucked up". Ms. Mosebach said she then reported the incident through the chain of command and that an investigation was initiated. Ms. Mosebach stated that after this took place, she told her experience to many other people since she felt that Mr. Murphy had tricked her and sexually assaulted her.

Ms. Mosebach stated that once she returned to the base in Portland, Oregon, she requested to see the exam room where the procedure had taken place, to see if she could remember any missing details. She stated that she opened a drawer in the exam table and located multiple PAP smear tools and "a thing of lube". Ms. Mosebach stated she was upset that the mentioned tools had not been "bagged up" and that the tools were visibly dirty. She stated that she demanded that the tools be seized which they were by personnel on the base. I asked Ms. Mosebach if the exam

For OSORIO, TIMOTHY B   Printed On 02-17-2015   1015                                         Page 5 of 7

## Port of Portland Police Department

SP# 43 2014-451832         **SUPPLEMENTAL**        REPORTED BY 44432

RELATED TEXT - NARRATIVE

room where she found these tools was locked. She stated it was not. I asked her if the drawer where she found these tools was locked. She stated it was not. I asked her if the exam room was being used presently for different types of evaluations. She said the room was used frequently. I was advised that the mentioned tools had been submitted to a lab by the military, in an attempt to determine if there was any DNA matter on the tools. I was told that no DNA matter was found on the tools.

I asked Mosebach to provide details regarding the investigation to this incident conducted by the military. I asked if she recalled her decision to not contact local law enforcement when this investigation initiated. She stated that she was taking her military attorney's advice, which she identified as Major Adams. She told me that she initially had been informed that her case was referred to the FBI, but that they had not taken the investigation and that it was referred back to the military. Ms. Mosebach stated that her military attorney, who she identified as Major Adams, had told her that she did not want to call the police because they would not prioritize the matter. Ms. Mosebach stated that she was persuaded not to call the police or local law enforcement. I asked Ms. Mosebach if she understood that by making the decision to not contact local law enforcement, there would not be a criminal investigation conducted. She stated she did. I asked her what type of investigation she expected to occur. She stated "A military one".

Ms. Mosebach stated that once she decided to proceed with a military investigation for this matter, she received a letter indicating that the matter would not have criminal ramifications based on the findings of their investigation. Ms. Mosebach stated she was upset about this, but that Major Adams assured her that this was the way to go. I asked Ms. Mosebach if she was offered a choice on who would conduct the investigation. She stated she was not. I asked her if she had told anyone during the initial phase of the investigation that she wanted the police to conduct a criminal investigation. She stated she had told Major Adams that she wanted to call the police, but that he had told her "You don't want to do that". Ms. Mosebach stated that she did not know why the military was not doing anything with regards to Mr. Murphy since he continued to perform his medical care on the base and on the civilian side.

I asked Ms. Mosebach why she had decided to contact local law enforcement once the military investigation was completed. She stated that Major Adams had told her that local law enforcement had been advised of the incident, but it was unclear why that decision had been made. Ms. Mosebach stated that she had actually not contacted local law enforcement on this matter, and that she had been informed by military personnel that someone in the military had reached out to the police. Ms. Mosebach stated she did not know why this decision had been made by the military. I asked once again if she recalled indicating her approval to have the investigation conducted by the military instead of local law enforcement. She stated she decided to proceed with the military investigation because of what Major Adams had told her. She stated again that she was not given the choice to contact local law enforcement. I asked Ms. Mosebach how Major Adams had been assigned to her. She stated Major Adams was assigned to her by the military.

I asked Ms. Mosebach to describe how she had met Mr. Murphy. She stated that approximately one year before the PAP smear, she had gone with her friend Tess to get some drinks after work. She stated they went to the Aloft hotel and that she observed Mr. Murphy who was with other officers in the bar. She stated she started talking with Mr. Murphy and the other people present, and that Mr. Murphy was buying them drinks. Ms. Mosebach stated that after that, Mr. Murphy would talk to her and her friend Tess at work when he stopped by their finance office. I asked Ms. Mosebach if she ever had a romantic relationship with Mr. Murphy. She replied "never". I asked

For OSORIO, TIMOTHY B   Printed On 02-17-2015   1015        Page 6 of 7

## Port of Portland Police Department

SP# 43 2014-451832                              **SUPPLEMENTAL**                              REPORTED BY 44432

RELATED TEXT - NARRATIVE

Ms. Mosebach if Mr. Murphy had been inappropriate with her prior to the procedure. She said he had not.

I informed Ms. Mosebach that I had contacted her civil attorney, identified as Joel Shapiro, who stated he was representing her in a civil manner involving Mr. Murphy. I told her that Joel Shapiro had informed me that he believed Mr. Murphy committed the crime of perjury and that he had documentation to prove the allegation. Ms. Mosebach stated that she was aware of the allegation, and that it stemmed from a document that Mr. Murphy had submitted indicating that the findings from the military investigation related to her case had not substantiated her claim that Mr. Murphy had conducted the mentioned procedure on her. She stated that the findings from the military investigation had indeed substantiated her claim of the sexual assault. Ms. Mosebach stated that Mr. Murphy had lied to the court.

I confirmed with Ms. Mosebach that she wanted to proceed filing criminal charges against Mr. Murphy. She stated she did. She told me that she did not think anything would happen to Mr. Murphy since no one witness her allegation, but that God knows what he did. With that I ended my interview with Ms. Mosebach. I later asked Ms. Mosebach to request a copy of her medical record from the military to submit with this report (See attached report).

I contacted Mr. Murphy via phone in an attempt to set up an interview with him. Mr. Murphy informed me that at the advice of his counsel, he would not provide a statement on this matter.

I also contacted the civil attorney representing Ms. Mosebach, identified as Joel Shapiro, who provided me with documents that he believes prove that Mr. Murphy committed the crime of perjury by submitting these documents in the Multnomah County Court House. I am attaching these documents to be reviewed by the District Attorney's Office. I am also attaching Ms. Mosebach's medical record from the military, and a document I received from the Air National Guard base indicating the discontinued practice of PAP evaluations at the base (see attached).

*** END OF HARDCOPY *** v.140929

Verified Correct Copy of Original 2/10/2016.

For OSORIO, TIMOTHY B    Printed On 02-17-2015  1015                                Page 7 of 7


Office

# OC1 Report

## Digital Files Enclosed

Company Name: _____

Contact Person: J.A. Murphy M.D

Phone: _____ Date: _____

File Name: _____ Date Created: _____

fedex.com  1.800.GoFedEx  1.800.463.3339

FedEx Office disclaims all warranties including, but not limited to, fitness for purpose of merchantability and shall not be responsible for any loss or damage to data or defects in material or manufacture. All trademarks used hereon are the property of their respective owners. FedEx Office requires written permission from the copyright holder to reproduce any copyrighted works. © 2012 FedEx. All rights reserved. 613.0P00.001

_Verified Correct Copy of Original 2/10/2016_

Multnomah County Circuit Court
Original Sent to File Room

Page 51 - Exhibit 2